# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
MICHAEL LEON BELL,
Defendant and Appellant.

S080056

Stanislaus County Superior Court
133269

---

May 2, 2019

Justice Corrigan authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Liu, Cuéllar, Kruger, and Groban concurred.

---

PEOPLE v. BELL

S080056

Opinion of the Court by Corrigan, J.

While his girlfriend and her teenage son waited outside, defendant Michael Leon Bell robbed a convenience store and fatally shot the clerk. He was convicted of murder in the course of a robbery along with burglary, robbery, shooting at an occupied vehicle, unlawful possession of a firearm, and enhancements for a serious felony conviction and personal use of a firearm.[1] The jury fixed the penalty at death. The court also imposed a determinate sentence of 25 years and 4 months on the additional charges and enhancements. We affirm the judgment.

## I. BACKGROUND

### A. *Guilt Phase*

Three surveillance cameras recorded a robbery of the Quik Stop convenience store in Turlock on January 20, 1997. The footage showed clerk Simon Francis dusting shelves at 3:54 a.m. when a man entered the store. The robber wore a ski mask and a dark hooded jacket. He appeared to be somewhere between six feet, two inches and six feet, five inches tall.[2] He wore gloves

---

[1]     Penal Code sections 187, 190.2, subdivisions (a)(17)(A) & (a)(17)(G), 211, 246, former 12021, 667, subdivision (d), 1192.7, subdivision (c), and 12022.5. All statutory references are to the Penal Code unless otherwise stated.

[2]     Defendant is six feet, five inches tall and, when arrested, weighed 260 pounds.

1

and carried a revolver. The robber grabbed Francis and pulled him across the store, telling him to open the safe. When Francis said he did not know the combination, the robber dragged him behind the counter to the cash register, which Francis opened. The robber ordered him to lie face down on the floor, grabbed cash from the register, and threw the money tray to the floor. He fired two shots at Francis and left. The robber was in the store less than a minute and escaped with $261. Surveillance equipment also recorded the sound of gunshots being fired outside after the robber left the store.

Shortly before 4:00 a.m., truck driver Daniel Perry stopped at an intersection near the Quik Stop and saw a tall man in a dark hooded jacket run out of the store. Perry pulled away but heard two gunshots. Believing he was being shot at, Perry kept going. He passed a dark sedan parked off the side of the road. As Perry watched from his side mirror, the sedan's lights came on and it drove off. Perry called the police. His truck had been dented near the passenger door. Later, police recovered a bullet from the driveway just north of the Quik Stop. Tire tracks and shoe prints were also visible nearby.

Truck driver Richard Faughn stopped at the Quik Stop at 3:58 a.m. The cash register drawer was open, and the clerk lay motionless behind the counter. The register's money tray sat against the clerk's leg, and change was scattered on the floor. Faughn called 911 and stayed until police arrived.

Emergency responders tried to resuscitate Francis without success. When they moved his body, they found a deformed bullet beneath him. Francis had been shot twice in the back. The fatal bullet traveled through his heart and lungs,

exiting through the chest. A second bullet lodged in his abdominal cavity.

Police identified defendant as a suspect and interviewed him. Defendant said he had been sick and spent the weekend of the murder at his girlfriend's apartment. He claimed he did not go to the Quik Stop or anywhere else the entire weekend. He said he had been with his girlfriend, Roseada T., her teenage son, Taureen "Tory" T.,[3] and Tory's friend, later identified as Robert D. Roseada drove a blue 1988 Chevrolet Beretta.

The police later arrested Roseada, searched her home, and impounded her car. Tread patterns from her car tires were compared with tire tracks found near the Quik Stop. Patterns from both front tires and the right rear tire could not be excluded as a source of marks left at the scene. Roseada helped police recover the murder weapon from a field. A .357 magnum revolver and several .38 caliber bullets were buried inside a green cloth case. Bullets fired from this gun matched slugs recovered from the crime scene and the victim's autopsy. Another bullet, recovered from outside the store, was too damaged for a comparison. Gunshot residue on the victim's sweater indicated that the gun was only one to two feet away when fired.

Witness Phillip Campbell recognized the revolver as one he had purchased from his brother-in-law and later sold to Nick Feder. Feder sold the gun to Debra Ochoa. Ochoa testified that

---

[3] Because Roseada and Tory share the same last name, and because Tory was a minor, we use their given names. Roseada died from natural causes on December 27, 1998, around three months before the trial began.

she had known defendant for approximately 14 years. She was not questioned about the gun. (See *post*, at pp. 37-39.)

Nathan N. was 15 years old at the time of the murder.[4] Roseada, Tory, and the defendant were all friends of his. Defendant borrowed a black hooded jacket, size XXXL, from Nathan about a month before the murder and returned it sometime thereafter. Nathan and his foster mother brought the jacket to the police. Nathan examined still images from the Quik Stop surveillance video and testified that the murderer's jacket looked like his.

Nathan recalled seeing defendant with a revolver two or three weeks before the robbery. Sometime later, defendant gave the gun to a friend. Roseada later asked Nathan and Felix F. to get the gun back. They brought the gun to Roseada, who cleaned it. Afterward, they buried it in a field inside a green package.

Tory, 14 years old at the time of the murder, testified as part of a plea agreement.[5] Defendant moved in with Tory and his mother sometime in 1996. In December of that year, defendant showed Tory a .357 revolver loaded with .38 caliber bullets. Defendant said he got the gun because he wanted to rob someone. One night, Tory saw the gun and a red ski mask in his mother's bedroom. Roseada and defendant were loading the gun and cleaning it with alcohol, which they said would prevent fingerprints. They also wrapped electrical tape around defendant's shoes to mask their appearance. Defendant wore a black jacket Tory recognized as belonging to Nathan. Tory

---

[4]    Nathan testified under a grant of immunity.

[5]    He pleaded guilty to being an accessory after the fact and was sentenced to time served.

understood his mother and defendant were preparing to commit a robbery and wanted to join them. Although Roseada protested, defendant convinced her to let Tory come along.

At defendant's direction, Roseada drove around looking for a store to rob. After defendant rejected some locations, they chose the Quik Stop because it had no customers and was in an isolated area. Defendant got out of the car and asked Tory if he should kill the clerk. Tory said no. When defendant ran out, holding cash in his hand, a large truck drove by. Defendant shot twice at the truck, got in the car, and Roseada drove off. Back at the apartment, they cleaned the gun and bullets. Tory buried the gun and burned defendant's shoes, as defendant told him to do. Tory identified defendant as the shooter in the surveillance video. Defendant told Tory he shot the clerk because he put up a struggle. He said he shot at the truck driver because he wanted to leave no witnesses.

The defense presented testimony from two boys who had been in custody with Tory in juvenile hall. Kenneth A. said Tory had bragged that he committed the Quik Stop murder and was going to let defendant take the blame for it.[6] Tory told Brandon T. he was in the car with his mother when her boyfriend committed the murder, but he described the boyfriend as "a black guy" from Las Vegas. He did not mention defendant. Tory also said he had buried the gun and burned a mask used in the crime.

---

[6] At 5 feet, 10 inches tall and 135 pounds, Tory was considerably smaller than defendant, but the defense stressed that police had originally described the suspect as someone under six feet tall and of slim build.

On rebuttal, Tory's grandmother testified that Roseada was once married to an African-American man from Las Vegas who died 10 months before the Quik Stop murder.

B. *Penalty Phase*

1. *Prosecution Evidence*

The victim's father testified that Francis was the youngest of seven children. He was very upset after Francis died and could not go to church or visit his son's grave. The victim's older sister described Francis as kind and understanding, "the jewel of our family." He was precious to her because she had raised him like a son. She suffered a stroke upon learning of his death. Francis was 27 years old and had been married less than two months when murdered. His wife's cousin described him as her "best friend" and "the nicest guy [she had] ever met." Shortly before his death, Francis was buying frames for wedding photographs and planning to pick up the videotape of his wedding. He never had a chance to see it. The prosecutor played a four-minute excerpt from the tape.

The prosecution presented extensive testimony about defendant's past. L.O. described a sexual assault in May 1991. She was 19 years old, living with the defendant and their two young children. Defendant came home angry and intoxicated. He dragged her to the bedroom, threw her onto the bed, removed some of her clothing, and tried to have sex with her. In her struggle to escape, L.O. suffered a swollen lip. She later learned she was more than three months pregnant with defendant's third child at the time.

In September 1993, defendant assaulted Patrick Carver.[7] Defendant and some others confronted Carver at a house where he was staying. A girl tried to provoke Carver into hitting her, while the group circled around him. This incident ended without a fight, but later that evening the group returned. Defendant dragged Carver out of his car and slammed him to the ground. Defendant repeatedly kicked Carver in the face while the others restrained him. After Carver was beaten into unconsciousness, defendant threw him over a backyard fence. Carver recalled being tied to a chair while the group continued to beat and kick him. At one point, defendant took Carver's knife, held it across his throat, and jabbed its tip into the top of Carver's head. Feigning concern at Carver's distress, defendant asked if he would like a drink. When Carver said yes, defendant turned on the garden hose and held it to Carver's mouth. As Carver started to drink, defendant grabbed his head and shoved the hose deep into his mouth. Carver began choking, shaking, and kicking. Defendant did not remove the hose until one of the others pointed a gun at him and said "that was enough." Defendant demanded money from Carver, who said he could get some from his family. The group drove to a pay phone. While Carver was using the phone, the police drove up and defendant fled.

Defendant assaulted two other men less than a year before the Quik Stop killing. In February 1996, he confronted Gary Wolford, claiming Wolford's friend had provided "some bad

---

[7] Two witnesses testified about this assault. Lawrence Smith, one of the assailants, testified during the prosecution's case-in-chief, and victim Patrick Carver testified in rebuttal. Carver identified his primary assailant as "Mike Brown" but said he did not recognize defendant as being this person.

crank." Defendant insisted Wolford take drugs with him to show he was not "a snitch and a rat" and demanded $100. He shoved Wolford to the ground, grabbed him by the neck, and smashed his head against a wall. After three to four hours, defendant let Wolford leave but warned that he would hurt Wolford if he did not get $100 by the next day. A month later, defendant assaulted Larry Woolridge, a friend he had known since childhood. Woolridge had given defendant $25 to buy marijuana. Defendant left with the money but returned and accused Woolridge of "being a cop." Defendant and another man pulled Woolridge outside, struck him in the face, and swung machetes at him. Defendant demanded Woolridge's money, which he surrendered.

Around a month after the Quik Stop murder, defendant led the police on a high-speed chase. A patrol officer saw defendant shortly after midnight, going 90 miles per hour on city streets. He slowed after passing the patrol car, but then drove through a stop sign and accelerated away with his headlights off. The officer pursued with lights and siren. Rounding a corner, the officer noticed defendant's car parked at the curb, apparently unoccupied. As the officer stood outside his patrol car, defendant sat up, started his car's engine, and sped away. The chase continued through narrow residential streets at speeds between 55 and 75 miles per hour. Defendant ran multiple stop signs and sometimes drove on the wrong side of the road. He was eventually forced to stop at a construction barricade. Defendant was uncooperative, initially refusing to leave the car or put his hands in the air. He yelled at officers and resisted being handcuffed. His blood alcohol content was between .10 and .11 percent.

Finally, sheriff's deputies described two incidents while defendant was in custody. Before trial began, a deputy discovered a jail-made knife, or shank, hidden inside one of defendant's shoes. It had been sharpened on both sides and tapered on one end to a sharp point. Hidden inside the other shoe was a piece of glass wrapped in tape. Later, during the penalty phase, deputies heard the sound of metal hitting the floor near defendant's cell. When they came to investigate, defendant handed over a shank he had hidden under his mattress.

Defendant stipulated that in September 1995 he was convicted of being a felon in possession of a firearm.

### 2. *Defense Evidence*

Joseph Black and Lawrence Smith gave additional details about defendant's fight with Patrick Carver. Black said the fight concerned Carver's delinquent rent. Carver wanted to brawl, but defendant "got the better of the fight." Black never saw defendant use a knife, jump on Carver, throw him over a fence, or force a garden hose into his mouth. Smith admitted that, contrary to his testimony for the prosecution, he did not initially tell the police about the knife, fence-throwing, or garden hose. He lied because he feared for his safety. However, he later told the police that defendant had hit Carver several times and used a knife. Black confirmed that the group drove to a pay phone so that Carver could ask his family for money and that defendant ran away when police arrived. The group falsely identified defendant as "Mike Brown."

James Park testified as an expert on conditions for California prisoners sentenced to life without parole. He showed pictures of a typical cell and explained that all life prisoners are

automatically assigned to a maximum security prison. Two 12-foot fences topped with razor wire surround the prison. Between them is a 13-foot high-voltage electric fence. Prisoners who get in "bad trouble" can be kept in secure housing for up to 23 hours a day. Those not confined in the secure unit can work, go to school, exercise, watch television, or visit prison shops and libraries.

Defendant's mother described his upbringing. She gave birth to defendant when she was 16 years old. He was nearly three months premature and weighed slightly over three pounds, requiring incubation for eight weeks. During his first two years, he was very sickly and frequently hospitalized. The family moved often because defendant's father was in the Air Force. At about age four, defendant was prescribed Ritalin for hyperactivity. His mother stopped giving it to him after a few days because of its effect on him. Defendant's father had little patience with defendant, and the parents separated when defendant was about 10 years old. His mother remarried, but defendant disliked his stepfather. Defendant was caught shoplifting and had increasing difficulties in school. Frustrated with the rules in his mother's house, defendant moved in with his girlfriend at age 16. He became more distant and frustrated. Defendant's younger siblings had no behavioral problems. Both were in college at the time of trial.

Defendant's mother said she loved him and was overwhelmed by the possibility he would receive the death penalty. Defendant's brother said he loved him, too. Defendant often advised his brother to stay in school and not behave as he had. L.O. testified that defendant was drunk on the night he sexually assaulted her, and she no longer hated him for it. She

allowed him to see their three young children. They would be devastated if he were executed.

Neuropsychologist Nell Riley testified. Defendant's IQ was 77, which, while not indicating mental retardation, was "a very low score" correlating with subnormal intelligence. He had severe dyslexia, poor reading skills, attention deficit hyperactivity disorder (ADHD), and impaired executive functioning. Defendant's prematurity and low birth weight put him at high risk for developmental disabilities. Such children often have lifelong challenges. They are frequently disruptive and have difficulty with others. Reading problems hamper their academic and work ability. Although Ritalin and other drugs can help, defendant did not have the benefit of these medications. Finally, Riley addressed an emotional outburst defendant made at the end of his mother's testimony. (See *post*, at p. 12.) Defendant's inability to control his emotions or behavior in this situation was typical for someone with his neurological deficits.

Psychologist Gretchen White compiled a psychosocial history based on available records and interviews with defendant and his family. Defendant faced "risk factors" at every developmental stage. He was negatively influenced by his prematurity and low birth weight, the young age of his mother, sickliness during early life, hyperactivity, his father's extended absences, and marital strife. Infants with birth weights as low as defendant's tend to display negative temperaments, ADHD, and low social competence. Defendant also suffered digestive problems and was hospitalized for anemia at seven months old. He suffered congestive heart failure and required a blood transfusion. At school, defendant demonstrated learning disabilities and low intelligence, which made him feel like a

failure. His world changed dramatically at age eight when his two siblings were born only a year apart. At age nine, he underwent two surgeries on his genitals but still had a deformity despite the attempt at correction. He was distressed by his parents' divorce and a lack of paternal attention. Defendant did not see his father after age 12 or 13. He felt rejected and had trouble adjusting to the new family arrangement. As an adolescent, defendant had conflicts with his authoritarian stepfather. He transferred to a different high school and was humiliated by his placement in special education classes. All these risk factors led to an increasingly troubled life.

### 3. *Rebuttal*

Sherriff's deputies testified about defendant's courtroom outburst. Defendant's mother was crying when she left the witness stand. The judge called for a recess and jurors started walking toward the jury room. Although the record is not clear, it appears the jurors were no longer present when the outburst began. Defendant began pounding on the counsel table with both fists, then stood and tried to lift the table. Three deputies grabbed him but were unable to subdue him. Additional deputies joined the struggle. One deputy was hit and thrown over the railing into the audience section. Another deputy struck defendant on the legs with a baton, to no avail. At one point, defendant grabbed a deputy by the hair and held her in a headlock. Ultimately, it took eight or nine deputies to restrain defendant, who was still struggling as he was carried out in handcuffs and leg irons.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Funds for Jury Consultant*

Defense counsel filed multiple requests for section 987.9[8] funds to hire a jury consultant. The court denied his requests but ultimately authorized an even greater amount for the appointment of *Keenan*[9] counsel. Defendant argues the rulings violated both state law and his rights to due process, equal protection, and a reliable penalty determination. There was no error.[10]

---

[8] Section 987.9, subdivision (a) provides in relevant part: "In the trial of a capital case . . . the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense. . . . Upon receipt of an application, a judge of the court, other than the trial judge presiding over the case in question, shall rule on the reasonableness of the request and shall disburse an appropriate amount of money to the defendant's attorney. . . . In making the ruling, the court shall be guided by the need to provide a complete and full defense for the defendant."

[9] *Keenan v. Superior Court* (1982) 31 Cal.3d 424, 430 provides that section 987.9 funds may be used to appoint second defense counsel in a capital case. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 407-408.)

[10] "With regard to this claim and virtually every other claim raised on appeal, defendant asserts that the error violated his rights to a fair trial and reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the California Constitution. In most instances, defendant failed to make these constitutional arguments in the trial court. Nevertheless, unless otherwise indicated, we consider the merits of these newly raised arguments because either (1) the appellate claim is of a kind that required no objection to preserve

### a. *Background*

Defense counsel first sought to retain Eda Gordon from New Mexico, who had assisted the Stanislaus County Public Defender's Office in a previous murder case. The court denied this request, noting that defense counsel was "quite competent to select his own jury," especially given that voir dire would be conducted largely by the judge. Counsel renewed his request in a supplemental declaration. He argued the district attorney had greater resources available for jury selection and funding a defense expert would ultimately save both money and time. After an ex parte hearing, the court again denied the request. The case was neither unusual nor complex. Defense counsel was "highly competent," with "considerable experience in trying capital cases." The court doubted whether retaining an expert would save costs because counsel would spend considerable time talking with the expert. Moreover, even assuming the district attorney had superior resources, the defense is not entitled to equivalency but only assistance that is reasonably necessary. Finally, the occasional approval of funds for a jury consultant did not suggest an expert was constitutionally required. The majority of murder cases are tried without one.

---

it, or (2) the claim invokes no facts or legal standards different from those before the trial court, but merely asserts that an error had the additional legal consequence of violating the Constitution. [Citation.] In those circumstances, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] Where rejection of a claim of error on the merits necessarily leads to a rejection of the newly asserted constitutional objection, no separate constitutional analysis is required and we have provided none." (*People v. Virgil* (2011) 51 Cal.4th 1210, 1233-1234, fn. 4 (*Virgil*).)

Less than a week after this ruling, defense counsel requested a new hearing on the ground that defendant was not present at the previous hearing and had not waived his right to attend. Another ex parte hearing was held before a different judge. At this hearing, a deputy public defender testified about his use of jury consultant Gordon in a recent murder trial. The case involved an African-American defendant who murdered an Assyrian clerk during a late-night convenience store robbery, which was captured on videotape. Although the jury found that defendant guilty with special circumstances, it returned a verdict of life without possibility of parole. The public defender explained in detail how the consultant assisted him, both in jury selection and later stages of trial. Defendant's counsel believed a jury consultant would be helpful because the community had become especially sensitive to violence committed by African Americans. The court concluded a jury consultant was not needed to ensure a fair trial and denied the requested funds. However, because defense counsel demonstrated a need for assistance in the jury selection process, the court invited him to submit a new application for a private investigator's services.

Defendant then sought $4,500 for investigative assistance during jury selection. The court granted $2,750 and specified that only previously authorized defense investigators Joe Maxwell and Robert Wood could be retained. A month later, defense counsel advised the court that both of these investigators had refused the assignment. He now sought $7,000 to retain Karen Fleming, an Oakland consultant experienced in selecting capital juries. The request was denied. Counsel later renewed his request for investigative funds and asked that the court expand its authorization to include investigators other than Maxwell and Wood. The court denied

additional funds but permitted counsel to hire a different investigator.

Defendant later renewed his request for a jury consultant after learning that a second deputy district attorney would assist in jury selection and trial. At an ex parte hearing, Deputy District Attorney Birgit Fladagar testified that a second prosecutor had been assigned to try the case jointly with her. Both would take an active role in jury selection. Defense counsel asserted that he also required assistance in jury selection, although he was not seeking a second lawyer. Counsel said he needed an expert's help identifying jurors who would be receptive to defendant's mitigation defense. The court once again denied the request, explaining it had never perceived a correlation between use of a jury consultant and a trial's result. Shortly after the hearing, defense counsel requested $6,750 to expand the authorization of previously appointed *Keenan* counsel to include assistance with jury selection.[11] This request was granted in full.

### b.    *Discussion*

Section 987.9 provides a mechanism for indigent capital defendants to seek funds for investigators, experts, and others whose assistance is needed to prepare or present a defense. In ruling on such a request, the court must consider the defendant's "need to provide a complete and full defense." (§ 987.9, subd. (a).) While the court should generally view a motion for assistance with "considerable liberality," it should also order the requested services only if the defendant

---

[11]    The prior appointment extended only to discovery, research, and motion and writ preparation.

demonstrates they are reasonably necessary. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 286; *People v. Guerra* (2006) 37 Cal.4th 1067, 1085.) The court here acted within its discretion. (See *Gonzalez and Soliz*, at p. 286.)

As defendant recognizes, we have previously upheld orders denying section 987.9 funds for a jury selection expert. (See *People v. Box* (2000) 23 Cal.4th 1153, 1182-1185 (*Box*); *People v. Mattson* (1990) 50 Cal.3d 826, 847-848 (*Mattson*).) The circumstances here are no more compelling. *Mattson* and *Box* both involved the murder of a child, yet the potentially upsetting nature of those crimes did not demand the use of a jury consultant. This convenience store robbery murder was not so unusual or complex that it would be particularly difficult to find impartial jurors. (See *Mattson*, at p. 848.) Although defense counsel argued he needed help identifying jurors who would be responsive to his mitigation case, it does not appear an expert was reasonably necessary to ensure a fair penalty trial. Defense counsel had extensive trial experience, which included death penalty cases, and was described by the court as highly competent. Experienced attorneys " 'are trained as well as anyone else to select juries.' " (*Box*, at p. 1184.) Defendant's claim is not supported by *Ake v. Oklahoma* (1985) 470 U.S. 1087, which held that psychiatric assistance must be provided when an indigent defendant presents a plausible insanity defense. "Unlike psychiatric expertise, . . . a jury selection expert . . . would not offer any expertise not already available to counsel." (*Box*, at p. 1185.)

Nor did the assertedly greater resources of the district attorney's office require the court to fund a jury consultant for the defense. The prosecution did not employ such an expert. Once it became clear that two deputy district attorneys would

be trying the case, the court expanded defendant's *Keenan* counsel appointment to include jury selection. As a result, the court *did* authorize section 987.9 funding to assist counsel with jury selection. Defendant's complaint is merely that the court funded a second lawyer for this purpose rather than one of his preferred experts. The decision fell within the court's ample discretion.

Finally, there was no equal protection violation. Defendant complains that if he had been represented by the public defender, that office could have hired a jury selection expert without obtaining court approval. Because his counsel was appointed from a panel of private attorneys, he had to apply for court funding. The premise of this claim is speculative. Although a public defender's office can hire an expert from its own funds, its ability to obtain reimbursement for this expense is also measured by section 987.9. (See Gov. Code, § 15201; Cal. Code Regs., tit. 2, §§ 1025.1, 1025.3; 67 Ops.Cal.Atty.Gen. 310 (1984).) Despite minor differences in the process, indigent defendants represented by the public defender's office have no greater access to state-sponsored jury consultants than those represented by private counsel. Both are entitled to state funding for a jury consultant only when such services "are reasonably necessary for the preparation or presentation of the defense." (§ 987.9, subd. (a).)

### 2. *Jury Selection*

Defendant contends voir dire was impermissibly restricted and the trial court failed to excuse panelists who were biased in favor of the death penalty. To the extent these claims were not forfeited, they lack merit.

The jury selection process consisted of both group and individual voir dire. Prospective jurors completed a 39-page questionnaire and came to court in groups of 15 or 16. For each group, the court read general instructions explaining the nature of the case, including the possibility of a penalty phase trial, and conducted a groupwide inquiry touching generally on bias and prejudice. Panelists were then questioned individually about their death penalty views. (See *Hovey v. Superior Court* (1980) 28 Cal.3d 1 (*Hovey*).) The court advised counsel in advance that it intended to ask each juror a specific set of questions to evaluate their qualification to serve under *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*). Both defense counsel and the prosecutor were given an opportunity to question each panelist during the sequestered voir dire. Jury selection proceeded over nine court days and comprises five volumes of transcript. At the conclusion of this process, defendant used 14 of his 20 peremptory challenges and did not express dissatisfaction with the jury selected.

### a. *Adequacy of Voir Dire*

Defendant makes several arguments concerning the adequacy of voir dire. He first asserts the court unfairly restricted voir dire because it curtailed questioning from defense counsel. The record is to the contrary. Defense counsel had an opportunity to question each prospective juror, sometimes at considerable length, during the sequestered voir dire. Counsel frequently used this questioning to probe panelists' assurances that they could be fair and to lay the groundwork for cause challenges. The court initially became frustrated with the length of this questioning and perceived that defense counsel was "putting words in" prospective jurors' mouths. It announced that attorneys would question the panelists first, followed by

court questioning, after which no further questioning would be permitted. Immediately after this decision, however, the court allowed defense counsel to ask follow-up questions of the next panelist. The court quickly reverted to its original pattern of questioning the jurors first and then allowing questions from counsel.

Defendant did not object to the adequacy of voir dire (see *People v. Foster* (2010) 50 Cal.4th 1301, 1324 (*Foster*)), nor does he identify any specific questions he was precluded from asking (see *People v. Vieira* (2005) 35 Cal.4th 264, 287). Assuming his claim of error was not forfeited (see *People v. Taylor* (2010) 48 Cal.4th 574, 608), it lacks merit. Although the court sometimes told defense counsel to limit or wrap up his questioning, any restrictions on voir dire were reasonable. We have repeatedly observed that the trial court has " 'considerable discretion . . . to contain voir dire within reasonable limits.' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 990; see *People v. Williams* (2006) 40 Cal.4th 287, 307.) This discretion extends to death qualification. (*People v. Butler* (2009) 46 Cal.4th 847, 859.) The court may limit attorney questioning as appropriate (*People v. Robinson* (2005) 37 Cal.4th 592, 614), and, indeed, "has a *duty* to restrict voir dire within reasonable bounds to expedite the trial." (*People v. Avila* (2006) 38 Cal.4th 491, 536, italics added.) Defendant's attorney had wide latitude to explore prospective jurors' biases. (*Hovey, supra*, 28 Cal.3d at p. 80; see *Mattson, supra*, 50 Cal.3d at p. 847.) He had an opportunity to question each prospective juror and typically did so. The mild limitations placed on counsel's questioning did not deprive defendant of an impartial jury.

Nor is there merit to defendant's related claim that the court impermissibly "chilled" defense counsel's advocacy by

threatening to end the *Hovey* voir dire. The first prospective juror called in for sequestered voir dire strongly supported the death penalty but clearly told the court he could keep an open mind and base his verdict on the evidence presented. Defense counsel asked several leading questions that attempted to portray the juror as unqualified to serve. The court expressed exasperation with this tactic and suggested counsel was abusing the voir dire process. If counsel continued to question jurors in this manner, the court said it would end the sequestered questioning and bring all panelists into court for group voir dire. Later that day, the court again expressed frustration at defense counsel's attempts to paint jurors as disqualified after they had promised to keep an open mind on penalty. Noting that defense counsel was "taking too long with each juror," the court proposed to avoid the problem by switching to group voir dire with the next panel. The court never did change the process, however, and individual, sequestered questioning continued until the conclusion of voir dire.

There was no discernable reduction in the extent of voir dire. "We have repeatedly held that 'there is no federal constitutional requirement that a trial court conduct individualized, sequestered voir dire in a capital case.'" (*People v. Jackson* (2016) 1 Cal.5th 269, 357.) In any event, considered in context, the court's statements about switching to group voir dire were mere expressions of frustration, and the court took no steps to change the process for later panels. Nor does defendant demonstrate that the statements impermissibly "chilled" his attorney's advocacy. Defendant now theorizes that counsel could have pursued other lines of inquiry with some seated jurors. The assertion is not persuasive. All attorneys have to make choices about the areas explored and the time devoted to

the process. Nor is a "chilling" effect evident from counsel's failure to ask probing questions of jurors that the defense might have found favorable for other reasons. Despite questionnaire responses defendant now claims were problematic, his attorney chose not to peremptorily challenge any of the jurors whose questioning defendant now claims was inadequate. The trial court's manner of conducting voir dire is not reversible unless it is clear the resulting trial was rendered fundamentally unfair. (*People v. Carter* (2005) 36 Cal.4th 1215, 1250.) No such showing has been made here.

Defendant also complains the court "did not engage in a *bona fide*" assessment of jurors' qualification to serve but found them qualified so long as they paid "lip service to neutrality" in responding to a series of rote, leading questions under *Witt*. Trial courts are obligated to make a conscientious effort to determine prospective jurors' views on capital punishment to ensure qualification to serve. (*People v. Wilson* (2008) 44 Cal.4th 758, 779.) However, the court does not necessarily shirk this obligation because it asks uniform questions that track appropriate qualification concerns. Indeed, we have previously "advised trial judges to 'closely follow the language and formulae for voir dire recommended by the Judicial Council . . . to ensure that all appropriate areas of inquiry are covered in an appropriate manner.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 538 (*Bolden*).)

In *People v. Leon* (2015) 61 Cal.4th 569, 588-589 (*Leon*), the *entire* voir dire of nearly every potential juror consisted of four questions addressing the *Witt* death-qualification

standard.[12]   The court rarely asked follow-up questions and permitted no attorney inquiry.  (*Leon*, at p. 589.)  Although we chastised this parsimonious approach, we concluded the voir dire was not so inadequate as to render the trial unfair.  (*Ibid.*)  Here, the voir dire was far more expansive.   The court questioned each prospective juror in accordance with the *Witt* standard and frequently asked additional questions.  It gave both attorneys an opportunity to inquire further and explore other areas of concern.  Defendant complains the court gave undue weight to favorable responses to the *Witt* questions, but the court was entitled to accept jurors' assurances that they could set aside personal feelings and judge the case fairly.  This is the heart of the death-qualification inquiry.  (See *Leon*, at pp. 591-592; *Lockhart v. McCree* (1986) 476 U.S. 162, 176.)  When jurors admitted they could not set aside their biases,

---

[12]    The questions were:  "(1) 'Do you have such conscientious objections to the death penalty that, regardless of the evidence in this case, you would refuse to vote for murder in the first degree merely to avoid reaching the death penalty issue?' (2) 'Do you have such conscientious objections to the death penalty that, regardless of the evidence in this case, you would automatically vote for a verdict of not true as to any special circumstance charged merely to avoid the death penalty issue?' (3) 'Do you have such conscientious objections to the death penalty that, should we get to the penalty phase of this trial, and regardless of the evidence in this case, you would automatically vote for a verdict of life imprisonment without the possibility of parole and never vote for a verdict of death?'  (4) 'Do you have such conscientious opinions regarding the death penalty that, should we get to the penalty phase of this trial, and regardless of the evidence in this case, you would automatically, and in every case, vote for a verdict of death and never vote for a verdict of life imprisonment without the possibility of parole?' "  (*Leon, supra,* 61 Cal.4th at pp. 588-589.)

either for or against the death penalty, the court properly excused them for cause. Moreover, to the extent defendant argues overreliance on the *Witt* questioning led the court to erroneously deny cause challenges and seat biased jurors, he forfeited this claim by failing to exhaust his peremptory challenges or express dissatisfaction with the jury. (See *post*, at p. 25.)

Nor is there merit to defendant's complaint that the court unfairly rehabilitated biased jurors with leading questions that signaled an " 'appropriate' " response. We recently rejected the same claim in *People v. Jackson*, *supra*, 1 Cal.5th at pages 358-359, explaining that " '[t]he possibility that prospective jurors may have been answering questions in a manner they believed the trial court wanted to hear identifies at most potential, rather than actual, bias and is not a basis for reversing a judgment.' " "Nor does the court's occasional use of leading questions when attempting to rehabilitate 'death-leaning' jurors suggest a lack of impartiality." (*People v. Mills* (2010) 48 Cal.4th 158, 190.) Here, the court posed rehabilitative questions to all prospective jurors who expressed opinions on the death penalty, including those who strongly *opposed* it. This questioning was neither unfair nor improper.

### b. *Denial of Cause Challenges*

Defendant claims the court erroneously refused to dismiss seven prospective jurors based on their death penalty views. (*Witt*, *supra*, 469 U.S. at p. 424.) He also contends another juror would have been incapable of judging the case impartially because the juror's wife received dialysis treatments from the murder victim's wife. He argues deferential review is improper

because the court was motivated simply to expedite voir dire, rather than ascertain jurors' true qualifications.

"Defendant's failure to exhaust his peremptory challenges or to express dissatisfaction with the jury as selected forfeits [these claims] on appeal." (*People v. Davis* (2009) 46 Cal.4th 539, 582; see *People v. Mickel* (2016) 2 Cal.5th 181, 216.) "Moreover, whatever the scope may be of the trial court's power or duty to excuse biased jurors sua sponte, any failure to do so does not 'excuse defendant's failure to preserve this issue for review.'" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 487.) Nor can defendant establish prejudice. None of the prospective jurors in question served on his jury. (See *Davis*, at p. 582.) Defendant excused six of the eight with peremptory challenges, and a seventh was never called into the jury box. The eighth was seated as an alternate but did not deliberate in either phase of trial. Where no challenged panelist actually served on defendant's jury, "'there is no basis for us to conclude that the jury empanelled was anything but impartial.'" (*Davis*, at p. 582; see *Hillhouse*, at pp. 487-488.)

### 3. Claims Related to Codefense Counsel's Later Employment with District Attorney

When a juvenile delinquency petition was filed against Tory T. in connection with the Quik Stop robbery, the court appointed the private law firm of Perry and Wildman. Attorney Alan Cassidy had primary responsibility for the case and represented Tory when he entered into a written plea agreement with the prosecution. Tory promised to testify against defendant and plead to a reduced charge in exchange for the prosecution's recommendation that he be released from custody and placed on probation. The next day, Tory testified at a preliminary hearing. During the months Cassidy represented

Tory, Cassidy had applied for and ultimately accepted an offer of employment with the Stanislaus County District Attorney's Office. Almost two weeks after Tory entered the plea agreement and testified at defendant's preliminary hearing, Cassidy started work at the district attorney's office.

Based on these facts, defendant filed a pretrial motion seeking recusal of the entire district attorney's office and disclosure of all communications between Tory and Cassidy. In the alternative, he argued Tory should be precluded from testifying at trial. Cassidy and the head of his former firm testified at a hearing on the motion. Both claimed the attorney-client privilege as to communications with Tory and the contents of his case file. Cassidy testified that the plea negotiations for Tory began early in the case and "had been pretty much finalized" well before Cassidy became aware of the opening at the district attorney's office. He stated that the possibility of this employment did not change his negotiations for Tory, and he acted at all times in Tory's best interest. Once at the district attorney's office, in accordance with its conflicts policy, Cassidy took no part in discussions about any cases handled by his former firm. Cassidy had no supervisorial role in the prosecutor's office.

The court refused to order production of Tory's case file because it contained privileged documents and defendant presented no ground for invading the privilege. The court also denied the motions to recuse the district attorney's office or preclude Tory from testifying. The district attorney's office and Cassidy had taken appropriate steps to prevent Cassidy's

involvement in the case, and the court found nothing to suggest interference with defendant's right to a fair trial.[13]

### a. Discovery Motion

Defendant contends his rights to confrontation, compulsory process, and due process were violated by the denial of discovery into Tory's discussions with his former attorney. We have previously rejected similar claims and do so again.

The attorney-client privilege, one of the oldest recognized, allows a client to refuse to disclose, and to prevent others from disclosing, confidential communications with an attorney. (Evid. Code, § 954.) The "fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters." (*Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 599.) The privilege is absolute (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 732 (*Costco*)) and can take precedence even over a criminal defendant's trial rights. Thus,

---

[13]   This hearing, very early in defendant's case, featured the first of his courtroom outbursts. (Another is described *post*, at page 61, footnote 17.) When the court was announcing its ruling, defendant interrupted:

"THE COURT:  . . . And it appears to me that he would get a fair trial.

"THE DEFENDANT:  Bull shit.

"[DEFENSE COUNSEL]:  Hey, that's enough.

"THE DEFENDANT:  I don't get no fair trial, man.

"THE COURT:  You haven't even had your trial yet, Mr. Bell.

"[DEFENSE COUNSEL, apparently speaking to defendant]:  That's okay.  That's enough.  This is not helping."

it is settled that "a criminal defendant's right to due process does not entitle him to invade the attorney-client privilege of another." (*People v. Gurule* (2002) 28 Cal.4th 557, 594; see *People v. Johnson* (1989) 47 Cal.3d 1194, 1228 (*Johnson*).) Nor does the withholding of material protected by the attorney-client privilege violate a criminal defendant's right to confrontation. (*Gurule*, at p. 594; see *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 54.)

Similar facts arose in *Littlefield v. Superior Court* (1982) 136 Cal.App.3d 477. Two individuals were charged with a series of murders, but one pleaded guilty with a promise to testify against the other. (*Id.* at pp. 480-481.) The remaining defendant sought to discover conversations between that individual and his public defender, arguing he needed these confidential communications to impeach this crucial witness against him. (*Id.* at pp. 481-482.) The Court of Appeal observed that the attorney-client privilege continues even after the relationship has ended, and that bolstering an attack on a witness's credibility was not a valid reason to invade the privilege. (*Id.* at pp. 482-483.) *Johnson*, *supra*, 47 Cal.3d at page 1228 adopted *Littlefield*'s reasoning against a similar challenge. As in those cases, defendant here was able to cross-examine Tory about the plea bargain and Tory's motivation for testifying. He was not entitled to obtain absolutely privileged communications between Tory and his attorney merely to bolster this attack. (See *Johnson*, at p. 1228; *Littlefield*, at p. 482.)

Nor is there merit to defendant's argument that the trial court should have held an in camera hearing to balance his constitutional rights against the confidentiality interests of Tory and his attorney. With few exceptions, none of which apply

28

here, the court may not require disclosure in order to rule on a privilege claim. (Evid. Code, § 915, subd. (a); *Costco, supra*, 47 Cal.4th at pp. 736-739.) To support a contrary position, defendant cites a dissenting opinion positing that in camera review and a balancing of interests might be appropriate to avoid "[e]xtreme injustice" when "a criminal defendant seeks disclosure of a deceased client's confession to the offense." (*Swidler & Berlin v. United States* (1998) 524 U.S. 399, 413 (dis. opn. of O'Connor, J.).) Justice O'Connor's concerns about preventing injustice after a client's death simply do not apply here. Tory was both alive and subject to cross-examination. The trial court correctly denied defendant's request and was not required to conduct an in camera hearing before doing so.

### b. *Motion to Recuse District Attorney's Office*

Defendant's recusal motion was properly denied. A motion to recuse the district attorney "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) "The statute 'articulates a two-part test: "(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?" ' " (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 (*Haraguchi*).) A "conflict" exists, under section 1424's first prong, whenever there is " 'a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.' " (*People v. Eubanks* (1996) 14 Cal.4th 580, 592 (*Eubanks*).) But recusal is not required unless, under the second prong, the possibility of unfair treatment "is so great that it is more likely than not the defendant will be treated

unfairly during some portion of the criminal proceedings." (*Haraguchi*, at p. 713.)

The trial court's decision on a motion to recuse the prosecutor is reviewed for abuse of discretion (*Haraguchi*, *supra*, 43 Cal.4th at p. 711), "even in capital cases" (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 728). The trial court's factual findings are reviewed for substantial evidence, and its application of the law will be reversed only if arbitrary and capricious. (*Haraguchi*, at pp. 711-712; *People v. Vasquez* (2006) 39 Cal.4th 47, 56.)

Defendant fails to show an abuse of discretion. Cassidy negotiated a plea bargain that served the best interests of his client. The terms of this agreement were discussed "well before" Cassidy applied for employment with the district attorney. The agreement was finalized before he started work there. Cassidy did not participate in any way in this case. His only conversations about the matter concerned scheduling his own appearance to testify at the recusal hearing. Drawing in part on cases from the civil context, defendant complains the district attorney's " 'ethical screen' " was inadequate because the office employed few attorneys and Cassidy's work area was located near those of defendant's prosecutors. The court credited Cassidy's sworn testimony that he took no part in any case discussions. Defendant offers nothing to the contrary beyond speculation. Even assuming the circumstances gave rise to a conflict, recusal was appropriate only if defendant could show a "real, not merely apparent," potential for prejudice. (*Eubanks*, *supra*, 14 Cal.4th at p. 592.) Because defendant failed to show an actual *likelihood* that he would receive unfair treatment as a

result of Cassidy's employment (see *ibid*.), the court properly denied the recusal motion.[14]

B. *Guilt Phase Issues*

1. *Alleged Confrontation Errors*

Defendant claims his constitutional rights to confrontation and effective cross-examination were violated three times during the guilt phase. To the extent the claims are not forfeited, there was no prejudicial error.

a. *Admission of Deceased Codefendant's Statements*

At the close of his guilt phase evidence, defendant called Detective Olson for additional questioning about the investigation. Among other things, defendant asked about the forensic testing done on a "possible bloodstain sample" taken from the Chevy Beretta's passenger door frame. Olson said he sent the sample to the Department of Justice for testing but never received the results. On cross-examination, Olson testified that there was little blood at the crime scene and no reason to believe a substance found on the car "at some point later on" would be blood. The following colloquy ensued:

---

[14] Defendant also contends section 1424 violates equal protection because it applies more relaxed ethical standards to conflicts arising in criminal prosecutions than in civil cases. Because he failed to raise this challenge below it is forfeited, as are his derivative claims that section 1424 violates due process and the right to a reliable penalty judgment. (See *People v. Alexander* (2010) 49 Cal.4th 846, 880, fn. 14.)

"Q: Did you also receive information from [Roseada T.][15] that things were done to that car subsequent or after the killing?

"A: That's correct.

"Q: Did she tell you that the car was washed?

"A: She said it was washed, yes.

"Q: At a professional car wash?

"A: I don't recall if she said professional. What I recall — at least the portion I recall is that she went out the next morning and washed down the interior of the car herself. That's what I recall.

"Q: Did she also talk about washing the exterior of the car, if you remember?

"A: I recall something about the exterior, but I don't know if she did it or a professional did it."

Defense counsel did not object to this testimony. During a recess, however, he complained that the prosecutor had elicited statements made by a codefendant in violation of *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123. Counsel said he had not objected at the time because he "didn't think that was the appropriate thing to do in terms of trial strategy," but he argued the testimony was material and grounds for a mistrial.

The court denied the motion. First, defendant failed to object, even though he had an opportunity to do so. Any problem could have been cured at that time. Second, defendant had opened the door to this evidence by questioning Detective Olson

---

**15** As noted, Roseada died of natural causes before trial.

about the failure to test possible blood found on the car, and the prosecution had a right to follow up and explain why testing would have been futile. The court invited defendant to submit an appropriate limiting instruction, but no such instruction was sought or given.

Although he asserted *Aranda/Bruton* error below, defendant now concedes the rule "has no application where, as here, the defendant and the codefendant whose incriminating extrajudicial statements are offered . . . are not jointly tried." (See *People v. Brown* (2003) 31 Cal.4th 518, 537 (*Brown*).) In any event, Roseada's statements about washing the car were not " 'facially incriminating' of defendant and so would not run afoul of the rule." (*Id*. at p. 537, fn. 5; see *Richardson v. Marsh* (1987) 481 U.S. 200, 207.) Defendant now complains the admission of Roseada's statements about washing the car violated his confrontation rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). Assuming this claim was not forfeited by defendant's failure to make a timely hearsay objection at trial (see Evid. Code, § 353), it also lacks merit.

Detective Olson related an out-of-court statement from Roseada, but the statement was admissible, regardless of its truth, to show its effect on Olson. It tended to explain why Olson had not pursued forensic testing of the possible blood stain found on Roseada's car. " ' "[E]vidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief . . . is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement." ' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162.) "Out-of-court

statements that are not offered for their truth are not hearsay under California law [citations], nor do they run afoul of the confrontation clause." (*People v. Ervine* (2009) 47 Cal.4th 745, 775-776 (*Ervine*).) Moreover, as the trial court observed, the defense opened the door by questioning Olson about his failure to test for blood on the car. Defendant's questioning insinuated that the investigation was sloppy, and Roseada's statement was admissible to rebut that suggestion. Accordingly, there was no confrontation clause violation. Although a limiting instruction was not given, defendant is in no position to complain. He failed to make a hearsay objection and, despite the court's invitation, failed to propose a limiting instruction.

#### b. *Testimony Regarding Citizen Informant's Identification*

Defendant's probation officer, Michael Moore, testified at the preliminary hearing that he called the Turlock Police Department after he recognized a newspaper photograph related to the Quik Stop murder. Moore was shown the surveillance tape and still images from the video. He told police that the shooter's posture, gait, and voice all resembled defendant. Defendant moved to exclude Moore's testimony from trial, arguing it would be irrelevant and unduly prejudicial. The court denied the motion, with the prosecution's assurance that the jury would not learn defendant was on probation.

Before Moore was called to testify, he informed the prosecutor that he recognized one of the seated jurors. The juror was an acquaintance who might know Moore's occupation. Defendant refused to agree to a stipulation in lieu of Moore's live testimony, and the prosecution decided not to risk a mistrial by calling Moore as a witness.

Later, defendant called Detective Olson and questioned him about the surveillance video. When asked why he had watched the video on one occasion, Olson replied, without naming Moore, that he "had a person that wanted to look at it." Defense counsel asked if Olson had "discussions with anyone about the height and weight of [the] perpetrator . . . after watching the videotape." Olson responded that he and the unnamed person had such a discussion while they watched the tape together, and this discussion informed his opinion about the suspect's appearance. On cross-examination, the prosecutor sought to flesh out this testimony. He requested permission to ask about information Olson had received from a citizen informant, promising not to name Moore or his occupation. The court remarked that the defense had "opened the door" and allowed the questioning.

The prosecutor elicited testimony that, the day after the crime, Olson met with a citizen informant who knew defendant. Olson showed this person the surveillance videotape and photographs and played an audiotape from the crime. The prosecutor then asked what the person said about how the photograph looked in relation to defendant. Before Olson could answer, the court interrupted and excused the jury. During the ensuing colloquy, defense counsel objected to the questioning on foundation and hearsay grounds and continued to dispute that his questions had opened the door for testimony about Olson's discussion with Moore. The prosecutor argued that Moore's statements identifying defendant as the person in the videotape could be admitted for the nonhearsay purpose of establishing why Olson proceeded as he did with the investigation. Although the court did not accept this argument, it allowed the prosecutor to elicit evidence of what Olson did after talking to the citizen

informant. Defense counsel did not object to this resolution. Back on the stand, the prosecutor asked Olson what he did "based on" watching the surveillance tape with the citizen informant. Olson replied, "I set up an appointment to meet with Michael Bell."

Defendant now complains "the identification statements of Michael Moore [related] through the testimony of Detective Olson" were hearsay, admitted in violation of due process and the confrontation clause. (See *Crawford, supra,* 541 U.S. 36.) Although Olson did not relate a hearsay statement attributable to Moore, defendant argues the informant's identification of him was obvious to jurors. Citing various federal appellate decisions, he argues *Crawford* extends to "testimony communicating the substance of an absent declarant's statements . . . even when there is no verbatim account of the declarant's testimonial hearsay." (See *Ocampo v. Vail* (9th Cir. 2011) 649 F.3d 1098, 1110; *Ryan v. Miller* (2d Cir. 2002) 303 F.3d 231, 250-251.)

Assuming without deciding that the claim was preserved, and a legitimate application of the hearsay rule, any error in the admission of Olson's testimony was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18.) An implied identification from an unidentified citizen informant was not significant given the considerable direct and circumstantial evidence placing defendant at the crime scene. Neither side mentioned it during closing argument. Defendant's claim that Tory committed the crime was comparatively quite weak. The defense was itself based primarily on hearsay and did not account for the significant disparity in the two men's statures. Defendant was close to 6 feet, 5 inches tall and 260 pounds, while Tory was only 5 feet, 10 inches, and 135 pounds.

Finally, the jury viewed the tape repeatedly. They saw Tory testify and saw defendant daily. They were able to form their own opinions about whether defendant was the person in the surveillance tape.

### c. *Witness Who Invoked Privilege Against Self-incrimination*

Before trial, defense counsel learned that prosecution witness Debra Ochoa was on felony probation or parole and would claim her Fifth Amendment privilege against self-incrimination if asked questions about gun possession or ownership. The prosecution hoped to show that the murder weapon was sold to Ochoa, who gave it to defendant. Defense counsel said he would not object to the prosecutor establishing Ochoa's possession of the gun through other witnesses but opposed mention of her expected testimony during opening statements. The prosecutor agreed, and the topic was not mentioned in openings.

During the prosecution's case-in-chief, Los Angeles resident Phillip Campbell testified that he sold a .357 Smith & Wesson revolver to Nick Feder in 1995. Feder testified that he purchased the gun from Campbell and four or five months later sold it to his friend Debra Ochoa. Feder said the murder weapon recovered by the police looked just like the gun he sold Ochoa.

Before Ochoa's testimony, the court held a hearing outside the jury's presence. In response to the prosecutor's questions, Ochoa said defendant had been her friend for approximately 14 years and had worked for her on many occasions. When defense counsel asked if she ever gave defendant a handgun, Ochoa invoked her Fifth Amendment privilege. Arguing Ochoa's invocation prevented an effective cross-examination, defendant

moved to exclude her testimony and strike the testimony of Feder and Campbell. The prosecutor responded that any cross-examination about the gun would be outside the scope of her direct, which would be limited to questions about Ochoa's relationship with defendant. The court permitted the prosecution to call Ochoa but ruled neither party could ask her questions that would elicit an invocation of the privilege. In the jury's presence, Ochoa testified that she had known defendant for approximately 14 years. Defendant did not cross-examine.

Defendant now complains the court violated his confrontation rights by allowing Ochoa to testify because her anticipated claim of privilege prevented him from cross-examining her about the gun. Prosecution witnesses traced the gun to Ochoa before the crime. After the crime, witnesses described receiving the gun from defendant. Defendant argues his inability to cross-examine Ochoa was prejudicial because he could not combat the prosecution's inference, advanced in both guilt and penalty phase closing arguments, that Ochoa had given defendant the murder weapon. The claim lacks merit.

The trial court properly explored Ochoa's claim of privilege and instructed the parties not to ask questions that would prompt its invocation. (See Evid. Code, § 913, subd. (a); *People v. Frierson* (1991) 53 Cal.3d 730, 743.) The constitutional concern raised by a witness's assertion of the Fifth Amendment is that the witness cannot be cross-examined about the testimony that elicited the claim. (See *People v. Douglas* (1990) 50 Cal.3d 468, 508.) There was no Sixth Amendment violation here because the trial court's ruling prevented Ochoa from providing any testimony that would have evaded cross-examination. The prosecution properly asked about Ochoa's relationship with defendant, which was relevant. Defendant

was free to cross-examine her on that subject. If defendant wished to dispel the inference that Ochoa gave him Feder's gun, he could have asked whether she saw defendant during his trip to Los Angeles, or generally how they spent that time together. Defendant was not precluded from eliciting facts about their friendship that might have cut against the inference that Ochoa gave him a weapon.

It also bears noting that any hindrance of defendant's cross-examination resulted from Ochoa and was not attributable to the People or the court. Her "attorney's decisions regarding the best means to defend her, including the advice to invoke the privilege against self-incrimination, may not have been consistent with defendant's interest, but they do not establish prosecutorial manipulation or any other impropriety." (*People v. Mincey* (1992) 2 Cal.4th 408, 442, fn. 7 (*Mincey*).) To the extent defendant contends the prosecution should not have been allowed to call Ochoa without granting her immunity, he did not request this remedy below. Although defendant now speculates that Ochoa could have given the gun to someone else, he also risked the possibility that her testimony would be quite damaging. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20.) The prosecution was not required to grant unsolicited immunity or forgo calling a relevant witness under these circumstances.

### 2. *Admission of Surveillance Videotape*

Before trial, defendant moved under Evidence Code section 352 to exclude the audio from the crime scene

surveillance video. He argued the victim's noises after being shot were "extremely prejudicial" and not probative. After listening to the tape, the court disagreed, noting that the tape was probative to show what happened during the offense. Moreover, the tape captured the sound of two gunshots outside, which corroborated the account of the truck driver who said he was shot at by someone who had just come out of the store. The court took the matter under submission but was inclined to find that the audiotape's probative value outweighed any prejudice. The record does not include a ruling on defendant's motion. However, in later proceedings the attorneys repeatedly observed that approximately two minutes of footage containing the victim's dying sounds had been edited out of the videotape shown during the guilt phase.

The prosecution played the videotape with two guilt-phase witnesses. During the testimony of store owner Henry Benjamin, the prosecutor played footage that simultaneously displayed images from four surveillance cameras. She then showed footage of the crime captured by two additional cameras. A later portion of the videotape was shown during the testimony of customer Richard Faughn, who had found the clerk and called 911. The prosecutor played footage starting when Faughn entered the store and ending when responding officers arrived at the scene. The video was also played during the prosecution's guilt phase closing argument.

Defendant's opening brief on appeal contends the trial court erred by allowing the prosecutor to repeatedly play sounds of the victim dying during the guilt phase of trial. However, apart from his response immediately upon being shot, the victim's sounds were *redacted* from the video shown in the guilt phase. Defendant's own trial attorney observed that the court

had "limited the playing of the [tape] to the video only without the sounds." Accordingly, defendant's claim is at variance with the record. To the extent defendant now argues the court erred in allowing video images of the crime to be shown multiple times, the claim has been forfeited. Defense counsel specifically told the court, "I'm not objecting to the tape or any portion of the tape except the small portion that records the victim's dying." The court addressed that issue by having the sounds removed. Defense counsel questioned the wisdom of showing the crime from multiple camera angles after the video proved to be upsetting to the victim's family members who attended the trial. But he did not raise an objection. In any event, there was no error. The videotape was highly probative evidence of how the crime was committed. Further, because the victim was shot while lying behind a counter, images of the victim sustaining the wounds were not presented.

During the penalty phase, the prosecutor sought to play the entire surveillance tape, including the two minutes after the shooting that had been redacted in the guilt phase. Over defense counsel's objection that sounds of the victim dying were "inflammatory," the court observed that a murder victim's last moments are relevant at the penalty stage. The court admitted the entire tape, and the prosecutor played it during her closing argument. Defendant claims the court erred because the record does not affirmatively establish that the court weighed the tape's relevance against the potential for undue prejudice. (See Evid. Code, § 352.) He argues the prejudicial effect of the victim's dying noises was "compounded" by statements in the prosecutor's closing argument imagining what the victim's last thoughts might have been. Defendant did not object to these

statements in the prosecutor's closing argument, and his appeal does not claim the argument was improper.

The court has discretion to exclude evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " ' "Prejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, a section 352 objection should fail. [Citation.] . . . The prejudice that section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.) "An exercise of discretion under

Evidence Code section 352 will be affirmed unless it was arbitrary, capricious, or patently absurd and the ruling resulted in a miscarriage of justice." (*People v. Winbush* (2017) 2 Cal.5th 402, 469 (*Winbush*).)

As to victim photographs, the court's discretion under Evidence Code section 352 to exclude evidence showing circumstances of the crime "is much narrower at the penalty phase than at the guilt phase. This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences ([Pen. Code,] § 190.3, factor (a)), and because the risk of an improper guilt finding based on visceral reactions is no longer present." (*People v. Bonilla* (2007) 41 Cal.4th 313, 353-354; see *People v. Anderson* (2001) 25 Cal.4th 543, 591-592.) At the penalty phase, the jury "is *expected* to subjectively weigh the evidence, and the prosecution is entitled to place the capital offense and the offender in a morally bad light." (*Box, supra,* 23 Cal.4th at p. 1201.)

The court did not abuse its discretion in admitting the unredacted videotape in the penalty phase. There is no dispute that it accurately represents the events depicted. The prosecution was entitled to demonstrate the full extent of the suffering defendant inflicted on his victim. We have listened to the penalty-phase tape. The sounds are relatively brief, lasting around 30 seconds. While unpleasant, they are not so gruesome that they would distract the jury or prevent it from performing its proper role.

### 3.   *Character Evidence*

Defendant asserts the court erred in allowing Kenneth A.'s mother to testify about her son's untruthfulness. Kenneth, who

testified for defendant, said Tory had bragged in juvenile hall that he had committed the Quik Stop murder. The prosecution called Kenneth's mother in rebuttal. Regina A. had raised her son until he was 13. During the ensuing six years, they had only infrequent contact when she visited Kenneth in juvenile hall or county jail. Regina thought she knew her son well, although not "real well." She knew his family members but not many of his friends or neighbors. Over defendant's objection, the court allowed Regina to give an opinion that sometimes Kenneth was truthful and sometimes he was not. She said he had been known to lie at times to gain an advantage for himself. Defendant also objected unsuccessfully when Regina was asked whether Kenneth had a reputation among family members for truthfulness. She responded, "they probably would think that he wasn't truthful."

Evidence of a witness's character for truthfulness, or its opposite, is relevant to credibility and admissible for this purpose. (Evid. Code, § 780, subd. (e).) This evidence may be shown by "(a) evidence of specific instances of conduct, (b) opinion evidence, or (c) reputation evidence." (Simons, Cal. Evidence Manual (2018) Witnesses, § 3:49, p. 288.)

Defendant concedes evidence of Kenneth A.'s character for truthfulness was admissible but argues there was insufficient foundation for Regina's testimony about it. A lay witness may testify to an opinion if the testimony is based on the witness's personal observations or knowledge. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1306-1307.) "An individual who has known a witness for a reasonable length of time or who knows the reputation of that witness for honesty and veracity in the community may qualify to testify as to the witness' character for honesty or veracity." (*People v. Sergill* (1982) 138 Cal.App.3d

34, 39.) Regina had raised her son for 13 years. Although her contact with Kenneth grew less frequent, she continued to visit him during the time he was in custody. These contacts were more than adequate to establish a foundation of personal knowledge. (See *People v. Kipp* (1998) 18 Cal.4th 349, 371.) Nor did the court err in admitting reputation testimony. Although Regina could not speak to Kenneth's reputation among friends and neighbors, she was aware of his reputation for honesty among family members. Her testimony about Kenneth's reputation was limited to these family views. (See *People v. Cobb* (1955) 45 Cal.2d 158, 164.)

### 4. Alleged Instructional Errors

#### a. Credibility of a Drug Addict

Several prosecution witnesses, including its key witness Tory T., admitted being under the influence of alcohol or drugs at the time of the events they described. At the close of the guilt phase, defendant requested an instruction stating: "The testimony of a drug addict must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs. The jury must determine whether the testimony of the drug addict has been affected by the drug use or the need to obtain drugs." The court properly refused to give the instruction.

"[A] trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*).) Instructions that highlight specific evidence, or invite the jury to draw inferences favorable to one side, are considered argumentative

and generally should not be given. (*People v. Earp* (1999) 20 Cal.4th 826, 886; *Mincey*, *supra*, 2 Cal.4th at p. 437.)

In directing the jury to examine the testimony of certain prosecution witnesses with greater skepticism, defendant's proposed instruction was argumentative. It implied that witnesses had not only used drugs but were addicted to them. It was also duplicative of a proposed instruction the court *did* give, with modification, at defendant's request. The jury was instructed: "In determining the credibility of a witness, you may consider the witness's capacity to hear or see that about which the witness testified and the witness's ability to recollect or relate such matters. [¶] Specifically, in this regard, you may consider whether any witness was under the influence of alcohol and drugs or other intoxicants at the time the witness testified. If you believe that any witness was under the influence of alcohol, drugs or other intoxicants at the time the witness testified, this factor may be considered by you in judging the credibility of the witness." The court did not err in refusing to give defendant's duplicative instruction on the same topic.

Although defendant contends federal courts have allowed similar instructions, the decisions he cites involved "a far narrower category of witnesses—namely, *narcotics addicts who are paid informers for the Government with criminal charges pending against them.*" (*U.S. v. Kinnard* (D.C. Cir. 1972) 465 F.2d 566, 572; see *U.S. v. Collins* (5th Cir. 1972) 472 F.2d 1017, 1018.) Paid informers present special reliability concerns not present here. Moreover, federal courts have held that the "addict-informer" jury instruction is not required if the witness has been cross-examined about the addiction or if another cautionary instruction has been given. (*U.S. v. Vgeri* (9th Cir. 1995) 51 F.3d 876, 881.)

### b. *Lesser-included Offense of Firearm Discharge*

Defendant was charged with the felony of maliciously and willfully discharging a firearm at an occupied vehicle (§ 246) when he shot at truck driver Daniel Perry. A related statute, section 246.3, subdivision (a), makes it a public offense to "willfully discharge[] a firearm in a grossly negligent manner which could result in injury or death to a person." The only difference between the two crimes is that the charged offense "requires that an inhabited dwelling or other specified object be within the defendant's firing range." (*People v. Ramirez* (2009) 45 Cal.4th 980, 990 (*Ramirez*).) Section 246.3, subdivision (a) is a necessarily included lesser offense of section 246. (*Ramirez*, at p. 990.)

" '[A] trial court must give " ' "instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." ' " [Citation.] "As our prior decisions explain, the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." [Citation.]' [Citation.]" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 477.)

The People contend defendant invited any error. The trial court asked whether additional instructions were needed on lesser offenses; defense counsel agreed they were not. The

invited error doctrine bars an appellate challenge to the absence of a lesser included offense instruction if the defendant, for tactical reasons, persuaded the trial court to forgo giving the instruction. (*People v. Beames* (2007) 40 Cal.4th 907, 927-928; *People v. Horning* (2004) 34 Cal.4th 871, 905.) However, the doctrine does not apply if defendant merely acquiesced in the absence of an instruction. (*People v. Avalos* (1984) 37 Cal.3d 216, 229.) "The record must reflect that counsel had a deliberate tactical purpose." (*Ibid.*; accord *Moon, supra,* 37 Cal.4th at p. 28.) Because the record here reveals no such purpose, nor indeed any discussion of a specific instruction, the doctrine does not apply.

The People also argue there is no substantial evidence defendant committed only the lesser offense. "The crime of shooting at an occupied vehicle 'is not limited to shooting *directly* at [the] occupied target.' (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1355-1356.) Rather, the applicable statute 'proscribes shooting *either* directly at *or* in close proximity to an . . . occupied target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the target or persons in or around it.' " (*People v. Phung* (2018) 25 Cal.App.5th 741, 761.) Thus, to find defendant guilty of section 246.3, subdivision (a) but not section 246, the jury would have had to find that defendant's shots were not aimed at or " 'in close proximity to' " Perry's truck. (*Phung*, at p. 761; see *Ramirez, supra,* 45 Cal.4th at p. 990.)

Two witnesses described the shooting.[16] Perry testified that he saw someone emerge from the Quik Stop and heard two shots. The shooter was running toward his truck. Perry later found a dent in his passenger door, which suggested the vehicle had been hit. Perry thought the shots were directed at him but never said he saw the shooter aim at his truck. Tory, however, testified that he saw defendant shoot *at* Perry. According to Tory, defendant also said he "shot at the trucker" because defendant wanted to leave no witnesses. Defendant argues the jury could have disregarded Tory's testimony because he "had significant credibility problems." Even so, the record includes no evidence that defendant fired aimlessly or into the air. " 'Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense.' " (*People v. Rogers* (2009) 46 Cal.4th 1136, 1169.) There was no substantial evidence that defendant was guilty only of a grossly negligent firearm discharge. The court had no sua sponte duty to instruct on this lesser offense. (See *People v. Huggins* (2006) 38 Cal.4th 175, 215-217 (*Huggins*).)

Instructions on lesser included offenses are not constitutionally required in a noncapital case. (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) Nevertheless, defendant contends the court's failure to instruct on section 246.3, subdivision (a) violated due process and denied him a reliable penalty determination. He argues that, in a capital case, due process requires instructions on all lesser included offenses supported by the evidence. (See *Beck v.*

---

[16] The jury may also have heard gunshots in the store's surveillance video, but the sound would not have disclosed where the shots were aimed.

*Alabama* (1980) 447 U.S. 625, 637-638.) The constitutional concerns in *Beck v. Alabama* are not implicated when, as here, substantial evidence does not support an instruction. (*People v. Romero* (2008) 44 Cal.4th 386, 404 (*Romero*).) Moreover, defendant's federal authorities discuss the importance of instructing on lesser noncapital offenses that are necessarily included within a *capital* charge. (See *Beck*, at pp. 634-637.) Here, defendant's claim centers on a lesser offense to an auxiliary charge that is *entirely separate* from his first degree murder conviction.

### 5. *Prosecutorial Misconduct*

Defendant argues the prosecutor committed misconduct by trivializing the reasonable doubt standard during the guilt phase closing argument. The claim fails.

Before closing arguments, the jury heard numerous instructions including one defining reasonable doubt (CALJIC No. 2.90). Referring back to this instruction, the prosecutor made the following statements in his rebuttal argument: "You have got an instruction about reasonable doubt. . . . Reasonable doubt is not all possible doubt. It has to be based on reason. [¶] If I take this quarter and flip it in the air over a hard surface, it's possible it could land on heads or it's possible it could land on tails. It's reasonable either way. It's reasonable because it's based on physics, logic and reason. [¶] But if I flip this coin up in the air and expected it to land smack dab on its side and stay standing still, is it possible? Sure, it's possible. Anything is possible, but is it reasonable?" The court overruled defendant's objection that this argument misstated the reasonable doubt standard.

"As we have often explained, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation].' (*People v. Marshall* (1996) 13 Cal.4th 799, 831.) Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) Improper comments falling short of this test nevertheless constitute misconduct under state law if they involve use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*Ibid*.) To establish misconduct, defendant need not show that the prosecutor acted in bad faith. (*Id*. at p. 822.)" (*People v. Cortez* (2016) 63 Cal.4th 101, 130 (*Cortez*).) However, "[w]hen attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)

"The case law is replete with innovative but ill-fated attempts to explain the reasonable doubt standard." (*Centeno*, *supra*, 60 Cal.4th at p. 667.) We have generally discouraged prosecutors from using colorful analogies or displays on this topic. (*Ibid*.)

The prosecutor's coin-toss analogy here was somewhat problematic because it is commonly linked to the concept of probability and 50-50 odds. Prosecutors should avoid drawing comparisons that risk confusing or trivializing the reasonable doubt standard. Nevertheless, it is not reasonably likely the

jury would have misunderstood the prosecutor's argument as suggesting they could decide the case by flipping a coin. This court does not " ' "lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' " (*Brown, supra*, 31 Cal.4th at pp. 553-554.)

Here, the prosecutor was attempting to explain the meaning of "reasonable." The jury had been properly instructed on the reasonable doubt standard, and the prosecutor's argument specifically brought their attention to this instruction. (See *Cortez, supra*, 63 Cal.4th at pp. 131-132.) In contrast to some other cases, the prosecutor here did not attempt to quantify reasonable doubt or analogize it to everyday decisions like whether to change lanes in traffic. (See *People v. Nguyen* (1995) 40 Cal.App.4th 28, 35-36.) He gave jurors an example of a possible or imaginary, but unlikely, occurrence. The statute defining the burden of proof expressly states that a "reasonable" doubt is not a mere " 'possible' " or " 'imaginary' " doubt. (§ 1096; see *Centeno, supra*, 60 Cal.4th at p. 672.) The prosecutor's argument did not undermine this standard. (See *Romero, supra*, 44 Cal.4th at p. 416.)

### C.  *Penalty Phase Issues*

#### 1.  *Claims Related to Defendant's Courtroom Outburst and Fight with Deputies*

Defendant raises several claims related to events after his courtroom outburst during the penalty phase. (See *ante*, at p. 12.) To recap:  Defendant became upset when his mother cried while leaving the stand. Defense counsel asked for a recess, and the jurors left the courtroom. Defendant began banging on counsel table with both hands, making noises, and

trying to lift the table. Courtroom deputies surrounded him and a scuffle ensued. During this time, the judge retreated to his chambers. It ultimately took nine deputies three to five minutes to subdue defendant, and some deputies were injured. The judge later described the incident as the most serious courtroom disturbance he had seen in 17 years on the bench. After defendant was removed, the court and counsel discussed potential security measures (see *post*, at pp. 68-70) and jury instructions.

### a. Defendant's Absence from Later Proceedings

### i. Background

The next day, a Friday, defendant came to court in a wheelchair, wearing jail clothes, and reporting severe pain in his back and legs. Defense counsel believed the pain would prevent him from participating in trial that day. Counsel faced a dilemma, however, because witnesses had traveled to court to testify for the defense. After defendant and his attorney conferred, defense counsel reported: "Mr. Bell does not want to be here today. He wants to go back to his cell. . . . He understands that there will be testimony. He's willing to not be here. I told him what the testimony would be. [¶] I believe that his presence will not be required for me to effectively present the testimony that I'm going to be presenting and any redirect or any other things I have to do today in court. [¶] I think Mr. Bell's physical condition is such that he's going to be in pain, probably making some noise from having pain, moving around, which would distract me and disrupt the courtroom. Therefore, I think the Court can make a finding . . . under the case law that he can be excluded for that reason. [¶] I would be willing to

waive any other irregularities that the Court feels would be appropriate."

The court and prosecutor expressed concern that it would be error to proceed in defendant's absence. The court observed it could have excluded defendant from court the previous day, based on his behavior, and then asked defense counsel, "are you saying things might get disrupted again today . . . ?" Defense counsel confirmed that if the court did not grant defendant's wish to be excused from trial that day, there was "a strong possibility of further disruption." Based on defendant's express desire to be excused, his choice to wear jail clothing to court, his exceptional outburst the previous day, and his attorney's prediction of further disruption, the court found grounds to excuse defendant for the day. The court then suggested that the case could be continued to the following Monday. Defendant initially agreed with that suggestion, but the scheduling was problematic for his expert witness, Nell Riley. After again conferring with counsel, defendant expressly waived his right to be present. He said he understood two psychologists and two character witnesses would be testifying that day and specifically affirmed that he did not object to their testifying in his absence.

Immediately after defendant was excused from the courtroom, the court and counsel discussed a note from the jury about defendant's violent behavior the previous day. (See *post*, at pp. 63-65.) The court questioned jurors about the note. In this discussion, the court noted defendant's absence and told the jury they could not consider it in deciding the case. Defense counsel then presented testimony from expert Nell Riley, defendant's brother Scheron Bell, and defendant's ex-girlfriend L.O. After a break in Riley's testimony, the court admonished the jury again not to speculate about defendant's absence "or

54

consider that in any way in making [its] decision." After the jury was excused for the day, the court and counsel discussed jury instructions and evidentiary issues.

Defendant returned to court on Monday, walking without assistance and wearing a suit. He reported that he felt "fine." The court asked if defendant was going to be disruptive, and defense counsel responded he was no longer concerned about disruptions because defendant was feeling better. The court stressed that defendant had not been excused solely because he reported being in pain. The court told counsel: "I didn't get that from what you said on Friday, that his disruptive behavior would only be because of the pain. . . . I was prepared to put the case over [until] Monday to see if he felt better. [¶] You didn't want to put the case over because you had your witnesses here and then you talked to Mr. Bell again, and . . . my interpretation of what you were saying is that, while he might be disruptive because of his pain, he might also be disruptive because I wasn't going to let him go back to his jail cell. [¶] I don't want anything in the record here to indicate that we excluded him from trial against his will or just because he was in some pain after that incident on Thursday. I mean, if that's the case, you can call your witnesses back here and we will put them on again . . . ." Defense counsel did not ask to recall his witnesses. Instead, he responded: "Your Honor, I think that it's clear from the record that was taken on Friday that Mr. Bell did not want to be here, that . . . — yes, I probably indicated that the disruption could have come from two sources. I am not now trying to backpedal on what I said on Friday."

## ii.  Discussion

Defendant now contends his absence from trial violated his rights to due process and confrontation under the state and federal constitutions and also violated state statutory law. Defendant waived his constitutional rights and any statutory error was harmless.

A criminal defendant accused of a felony has the constitutional right to be present at every critical stage of the trial, including during the taking of evidence.  (*Illinois v. Allen* (1970) 397 U.S. 337, 338 (*Allen*); *People v. Rundle* (2008) 43 Cal.4th 76, 133 (*Rundle*); *People v. Jackson* (1996) 13 Cal.4th 1164, 1209 (*Jackson*).)  " 'A competent defendant may waive that right, however.  [Citation.]  Neither the constitutional right to confrontation nor the right to due process precludes waiver of a defendant's right to be present at a critical stage of a capital trial.  [Citation.]' " (*Romero, supra*, 44 Cal.4th at p. 418; *People v. Weaver* (2001) 26 Cal.4th 876, 966 (*Weaver*).)  The waiver must, of course, be knowing, intelligent, and voluntary.  (See *Moon, supra*, 37 Cal.4th at p. 21.)

Defendant clearly and expressly waived his right to be present during Friday's proceedings.  Nevertheless, he now asserts his waiver was not voluntary because he was offered no meaningful alternatives.  The record belies this claim.  The court offered to continue the trial until Monday, when defendant would presumably feel well enough to attend, but defendant's expert witness was not available that day.  Defendant now faults the court for failing to offer a longer continuance, but he did not seek one below.  On the contrary, defendant's attorney repeatedly said he was ready to proceed with the witnesses whose presence he had secured for that day, including an expert

neuropsychologist who had traveled to court at some expense. Although defendant was initially agreeable when the court suggested delaying the trial until Monday, he changed his mind after conferring with counsel. After this conference, defendant expressly affirmed that he wanted to return to his cell and for trial to proceed that day in his absence.

We found a waiver voluntary under similar facts in *Jackson*, *supra*, 13 Cal.4th 1164. There, the defendant came to court with a black eye. When the court refused to grant a continuance, the defendant expressed a preference to be absent that day. (*Id*. at p. 1209.) He was advised of his right to be present, told of the prosecution witnesses who would be testifying, and reminded he was eligible for the death penalty. (*Ibid*.) There, as here, the defendant made it clear he wished to be absent. (*Ibid*.) We found "no constitutional infirmity . . . with the defendant's voluntary waiver of his right to be present on a single day of the trial." (*Id*. at p. 1210.) The same conclusion obtains here. To the extent defendant faced a difficult choice, the problem was of his own making. His suit was badly rumpled and he was in pain following the fight he had precipitated with courtroom deputies. Although his behavior was subdued the next morning, he did not want to remain in court for the trial, even though witnesses *his* lawyer had brought to court would be testifying on *his* behalf. After consulting with counsel, he expressly waived his right to be present. Because the record confirms this waiver was knowing and voluntary, his absence from trial was not constitutional error. (See *Moon*, *supra*, 37 Cal.4th at pp. 20-21; *Weaver*, *supra*, 26 Cal.4th at pp. 966-967.)

The defense also urges statutory error. Section 977, subdivision (b)(1) states that in all felony cases, "the accused shall be personally present . . . during those portions of the trial

when evidence is taken before the trier of fact," unless he has executed a written waiver of that right in open court. Section 1043 generally provides that a felony defendant must be personally present at trial except that a defendant's absence will not prevent trial from continuing to verdict in: "(b) . . . [¶] (1) [a]ny case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom[, or] [¶] (2) [a]ny prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent."

"Thus, when read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions:  (1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1).  However, section 977, subdivision (b)(1), the subdivision that authorizes waiver for felony defendants, expressly provides for situations in which the defendant cannot waive his right to be present, including during the taking of evidence before the trier of fact.   Section 1043, subdivision (b)(2), further makes clear that its broad 'voluntary' exception to the requirement that felony defendants be present at trial does not apply to capital defendants." (*Jackson, supra*, 13 Cal.4th at p. 1210.)  This means that, under state law, "a capital defendant may not voluntarily waive his right to be present during . . . portions of the trial in which evidence is taken, and . . . may not be removed from the courtroom unless

he has been disruptive or threatens to be disruptive." (*Id.* at p. 1211.)

The People concede defendant could not waive his statutory rights but suggest the removal was appropriate because defendant was potentially disruptive. We generally defer to the trial court's determination as to when a disruption has occurred or is likely to occur. (See *People v. Welch* (1999) 20 Cal.4th 701, 774 (*Welch*); *Jackson, supra*, 13 Cal.4th at p. 1211.) Defendant's violent and prolonged outburst the previous afternoon had clearly disrupted the trial. Although he was not actively disruptive on Friday morning, his arrival in a wheelchair and jail clothes presented other difficulties. Generally, a defendant has the right not to appear at trial in jail clothing. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1362.) More importantly, defense counsel represented that there was "a strong possibility" defendant would once again disrupt the proceedings. He was upset, in pain, and did not want to be in court. Although counsel's later comments focused on potentially distracting noises and movements defendant might make, he did not exclude the possibility of another violent disruption if defendant were forced to remain in court against his wishes. Combined with the severity of defendant's outburst the day before, counsel's explanation of defendant's physical and mental state and unwillingness to attend court provided substantial support for the court's conclusion that defendant would be disruptive if compelled to be present. (See *Welch*, at p. 774.) Counsel's comments also essentially conceded defendant was not prepared to "reclaim" his right to be present by acting with appropriate decorum. (See § 1093, subd. (c); *People v. Banks* (2014) 59 Cal.4th 1113, 1180 (*Banks*).)

Even assuming the court erred in allowing defendant to absent himself, the error was purely statutory. (*Weaver*, *supra*, 26 Cal.4th at p. 968; *Jackson*, *supra*, 13 Cal.4th at p. 1211.) Reversal is required only if it is reasonably probable defendant would have obtained a more favorable result absent the error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) Any error in excusing defendant from the day's proceedings was clearly harmless. Defense counsel was well prepared to present the testimony of his witnesses. Defendant's absence occurred during his own case, not that of the prosecution. Defendant was aware of what his witnesses would say. In addition, the court offered the defense an opportunity to recall the witnesses to testify in defendant's presence, and the defense declined the offer.

The court also repeatedly and appropriately instructed the jury not to consider defendant's absence in deciding the case. Defendant now complains the jury might have drawn the damaging inference that he was absent because he had continued to engage in physically dangerous or threatening behavior, but he could have cured any potential harm by requesting a specific instruction. He did not do so. Indeed, lengthy or detailed admonitions may have risked drawing greater attention to defendant's absence. Moreover, some jurors were apparently unsettled by defendant's courtroom outburst. (See *post*, at pp. 63-65.) His absence the following day, "and the concomitant inability of the jury to observe him" in a wheelchair and jail clothing, "may actually have helped him." (*Weaver*, *supra*, 26 Cal.4th at p. 968.) Of course, a negative inference was also possible, but defendant offers nothing beyond speculation to suggest he was so prejudiced. The speculative nature of any

possible harm precludes a finding that the penalty phase verdict was affected.  (*Ibid*.)

Finally, to the extent defendant's complaint encompasses his absence on Thursday, immediately after his courtroom outburst, there was no statutory or constitutional error.  Under the federal and state constitutions, "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." (*Allen*, *supra*, 397 U.S. at p. 343; see *Banks*, *supra*, 59 Cal.4th at p. 1180.)  Similarly, section 1043 "provides that an *unduly disruptive* defendant, after being warned, may be removed from the courtroom until he 'reclaims' his right to be present by expressing his willingness to conduct himself properly. (See *id*., subds. (b)(1) & (c).)"  (*People v. Medina* (1995) 11 Cal.4th 694, 738.)

It was within the trial court's discretion to conclude defendant's violent physical outburst necessitated his removal from court and absence for the remainder of the afternoon's proceedings.  (See *Welch*, *supra*, 20 Cal.4th at p. 774.) Defendant had to be restrained by nine deputies after a violent outburst the trial judge described as the most serious he had seen in 17 years on the bench.  Nor was this defendant's first courtroom disruption.  We have noted defendant's expression of displeasure at the court's ruling on his discovery requests. (*Ante*, at p. 27, fn. 13.)  Again, two weeks before the courtroom melee, defendant interrupted the testimony of prosecution witness Nick Lauderbaugh with profanities and accusations of

lying.[17] After being cautioned that such outbursts could hurt him if the case reached a penalty phase, defendant apologized for his behavior. He was therefore on notice that courtroom disruptions were inappropriate and not to be tolerated. Although the record includes no evidence of an express warning, one was not required under the circumstances here. "Some misconduct, such as a violent assault in court, is so dangerous as to justify a defendant's removal *even without a prior warning*. [Citations.] Because 'dignity, order, and decorum' are essential to the administration of criminal justice, a trial court 'must be given sufficient discretion to meet the circumstances of each case.' (*Allen*, [*supra*, 397 U.S.] at p. 343.)" (*People v. Johnson* (2018) 6 Cal.5th 541, 557, italics added.) Defendant's statutory and constitutional claims also fail because he did not "reclaim" his right to be present Thursday afternoon by informing the court he wished to be readmitted to the courtroom and was willing to behave appropriately. (See *Banks*, *supra*, 59 Cal.4th at p. 1181.)

Finally, the proceedings defendant missed on Thursday afternoon were not critical. "A critical stage of the trial is one in which a defendant's ' "absence might frustrate the fairness of the proceedings" [citation], or "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge" [citation].' " (*Rundle*, *supra*, 43 Cal.4th at p. 133.) Defendant's outburst occurred

---

[17] When Lauderbaugh began answering a question about what defendant had said about the Quik Stop robbery, defendant interrupted, "Lying fool." Defense counsel immediately requested a break. The court agreed, and as it told jurors they were free to go outside, defendant said, "— shit. He's lying." The court observed, "Mr. Bell, you're not helping."

after the testimony of the last witness of the day, and the jury was sent home immediately afterward. In defendant's absence, the court and counsel described for the record what had happened and discussed various security options with the courtroom bailiffs. After touching on some evidentiary matters, they resumed a discussion about jury instructions. These proceedings consumed one hour, after which court recessed for the day. "[A] defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding." (*People v. Concepcion* (2008) 45 Cal.4th 77, 82, fn. 6.) A criminal defendant has no constitutional right to be present when the court and counsel discuss questions of law, including discussions on jury instructions. (*People v. Morris* (1991) 53 Cal.3d 152, 210.)

### b. *Potential Jury Bias Resulting from Outburst*

Defendant next claims the court failed to take appropriate steps to ensure the jury was not biased against him as a result of the incident. He also contends the court erred in denying his motion for mistrial. The court's voir dire and admonitions were adequate, and its mistrial ruling was not an abuse of discretion.

### i. *Background*

The morning after defendant's courtroom outburst, the jury foreperson sent out a note, which stated: " 'To whom it may concern: We the jury are concerned with walking past the Defendant while he is not restrained. Yesterday's event could have caused injury to some jurors that were rushed into the jury room during the incident.' " The court observed that jurors were

not in the courtroom during the disruption but might have heard it. At defense counsel's suggestion, the court called for the jury as a group, noting that individual questioning could be reserved for any juror who indicated concern about the ability to remain fair and impartial.

In response to the court's questions, the jury foreperson confirmed that jurors could hear the incident from the jury room. The note was based on their experience of the incident and not from a newspaper article or media report.[18] The court admonished jurors not to speculate about what might have happened in the courtroom, although they could consider testimony about the incident if it was presented. The court then stated, "I want to make sure that because of what happened yesterday no one is feeling biased or prejudiced in the case at this point in time and feels they could not make a fair decision based on the evidence." It invited any juror having such thoughts to alert the court by note or otherwise. A juror explained that they had sent the note because some of the jurors had been "shov[ed] and pushe[d]" into the jury room when the incident began. The court responded that when defendant returned, the court would "work it logistically so there won't be a problem with you — take care of any fears you might have." At defense counsel's request, the court asked if there had been any discussion of the incident in the jury room. The jurors confirmed that the only discussion concerned getting everyone in the room and locking the door. They did not discuss the facts of the case. The court then repeated, "If anyone does feel that

---

[18]    Defendant's outburst was reported in a local newspaper, although the article inaccurately suggested the jury was in the courtroom at the time.

something is bothering them about [the incident] or feel they couldn't be fair and impartial, please let us know, write a note or something like that."

At counsel's urging, the court again asked if jurors had discussed "the incident that was going on in the courtroom." The foreperson said that although they could hear "screaming and yelling" from the courtroom, the jurors discussed only the experience of being pushed into the jury room and how they wanted to ensure their safety walking past defendant in the future. Defense counsel declined the court's invitation to question the jury further. No other communication was received from the jury on this topic.

Defendant moved for a mistrial. His attorney expressed concern that jurors had discussed defendant's personality or said they were afraid of him. The court observed that, if jurors were afraid, defendant had "brought that on himself." It denied the motion. Although defendant might seek a new trial if he obtained evidence that the incident tainted the jury, the court found no basis for a mistrial at that time given the jurors' responses. The court invited defense counsel to propose a special jury instruction on the issue if he felt one was necessary.

### ii. *Voir Dire of Jury and Instructions*

Defendant argues the court did not conduct an adequate inquiry into the prejudicial effect of his courtroom outburst. He forfeited this claim by not asking for additional questioning. (See *People v. Holloway* (2004) 33 Cal.4th 96, 126.) The court specifically invited defense counsel to question the jury further about potential bias, and he declined.

The claim also fails on the merits. In general, the "court must conduct a sufficient inquiry to determine facts alleged as

juror misconduct 'whenever the court is put on notice that good cause to discharge a juror may exist.' (*People v. Burgener* (1986) 41 Cal.3d 505, 519.)" (*People v. Davis* (1995) 10 Cal.4th 463, 547; see *People v. Martinez* (2010) 47 Cal.4th 911, 942.) Not every incident warrants investigation, however. (*People v. Cleveland* (2001) 25 Cal.4th 466, 478.) The decision whether, and to what extent, investigation into possible juror bias is required " 'rests within the sound discretion of the trial court.' " (*Ibid*.; see *People v. Maury* (2003) 30 Cal.4th 342, 434.) Here, the record demonstrates adequate inquiry. The court questioned jurors about their conversations, ensuring they did not discuss the facts of the case. The court expressed its concern that jurors remain unbiased because of the incident and invited jurors to notify the court privately if they had any such inclinations. Defendant's speculation that jurors failed to disclose personal fears or bias has no basis in the record. Such speculation does not support a duty to inquire further. (See *People v. Williams* (1997) 16 Cal.4th 153, 231; *Davis*, at p. 548.)[19]

Defendant also faults the court for failing to instruct jurors to disregard their personal experiences of the outburst. The court admonished the jury not to speculate about what happened in the courtroom, although it could consider evidence about the incident that might be presented. If defendant believed any further instruction was necessary, he was obliged

---

[19]    At oral argument here, defendant's attorney argued the trial court should have separately questioned each juror about the incident. However, such focused questioning would have drawn further attention to the event and might have amplified its significance. For strategic reasons, defendant's trial counsel may have preferred to avoid this risk.

to request it. (See *People v. Lee* (2011) 51 Cal.4th 620, 638.) Defendant's failure to propose an instruction, even after the court invited him to do so, forfeits his claim of error. (See *People v. Clark* (2011) 52 Cal.4th 856, 942; *People v. Ledesma* (2006) 39 Cal.4th 641, 697-698 (*Ledesma*).) Moreover, it is far from clear that jurors *were* required to ignore their personal experience of defendant's courtroom outburst. (See *post*, at pp. 67-68; *People v. Williams* (1988) 44 Cal.3d 1127, 1156.) The absence of an instruction to this effect was not error.

### iii. Motion for Mistrial

Defendant asserts the court erred in denying his motion for a mistrial. In general, "a motion for mistrial should be granted only when ' "a party's chances of receiving a fair trial have been irreparably damaged." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 282.) "We review a ruling on a mistrial motion for an abuse of discretion. [Citations.] A trial court should declare a mistrial only ' "if the court is apprised of prejudice that it judges incurable by admonition or instruction." ' [Citations.] 'In making this assessment of incurable prejudice, a trial court has considerable discretion.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 501.)

The court properly refused to grant a mistrial. Defendant's motion was based on a concern that jurors were afraid of him, or had concluded he was a violent person, because of his courtroom outburst. However, we have long held that "a defendant may not be heard to complain when, as here, such prejudice as he may have suffered resulted from his own voluntary act." (*People v. Hendricks* (1988) 44 Cal.3d 635, 643.) In *People v. Williams*, *supra*, 44 Cal.3d at page 1156, we explained that, while it is misconduct for jurors to obtain

evidence from outside the court, "[i]t is not clear . . . that such a rule applies to the jurors' perceptions of the defendant, particularly when the defendant engages in disruptive or otherwise improper conduct in court. *As a matter of policy, a defendant is not permitted to profit from his own misconduct.*" (Italics added; see also *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1030 (*Lewis and Oliver*); *People v. Arias* (1996) 13 Cal.4th 92, 148.)   Denial of mistrial motions based on the defendant's own courtroom misbehavior have been repeatedly upheld.  (See, e.g., *Lewis and Oliver*, at pp. 1030-1031; *Huggins, supra*, 38 Cal.4th at p. 201.)   So too here.  As the trial court observed, any fear or prejudice the jurors felt as a result of defendant's courtroom outburst was a problem of his own making.   A criminal defendant " 'should not be permitted to disrupt courtroom proceedings without justification [citation] and then urge that same disruption as grounds for a mistrial.' " (*Lewis and Oliver*, at p. 1030.)

### c.   *Physical Restraints*

After defendant's outburst, the court ordered him physically restrained.  While not contesting this decision itself, defendant argues the court improperly deferred to security personnel regarding the type of restraints to employ and improperly imposed two visible forms of restraint.   He also contends the court erred by not instructing the jury to disregard the restraints.   To the extent defendant's claims are not forfeited, they lack merit.

### i.   *Background*

Shortly after defendant's outburst, the court discussed potential security measures with the courtroom bailiffs and counsel.  The court expressed concern for the safety of court staff

and counsel and found "ample grounds" to impose restraints. The bailiffs recommended placing defendant in full chains and seating him next to a deputy armed with a Taser. A third option was to place him in a REACT stun belt. Defense counsel agreed that "something is in order." Although doubtful about the need for full chains, counsel assured the court he was "not going to object to some kind of restraint." The court then stated it was inclined to order "whatever [security measure] the bailiffs feel is appropriate . . . because I am not a security person . . . [and] I don't want my people getting hurt." When defense counsel expressed concern that full chains would be visible to the jury, the court urged him to talk with the bailiffs off the record. The court observed the bailiffs had "been dealing with Bell from a security standpoint . . . for a few weeks" and had developed "a good sense" of his agitation level.

Defendant came to court in a wheelchair the next day, restrained with chains and wearing a stun belt. He left before the jury was called in. When he returned to court the following Monday, he was out of the wheelchair and wearing a suit but was still restrained with chains and the stun belt. The court concluded restraints were needed because of the violence of defendant's outburst. "I can't restrain him just because . . . somebody in the jail or something thinks he should be, but there has to be a reason for it. There certainly was a reason for it on Friday, and I am going to continue to think that there is a reason for it unless someone tells me differently. [¶] But based on what happened Thursday afternoon, he was a danger to the entire courtroom and the staff and the deputies. And so several deputies were bruised and clearly in some pain. So it was necessary for the safety of the entire courtroom, in my opinion, to restrain him on Friday. That's also after consulting the bailiff

and the deputies and security because of what happened [on] Thursday."

Before the jury entered the courtroom, the court asked if defendant wanted an instruction telling jurors not to consider the restraints. Defense counsel expressed doubt that the jury could see the restraints, but the court observed that it could see a handcuff and a bulge from the belt. The court explained, "There is legal authority to give that kind of an instruction, but there is also authority" supporting the absence of an instruction if "you don't want it brought to the jurors' attention." Defense counsel responded, "I don't think I want to draw their attention to it right now. If I think it's a problem, I will ask for it." The court suggested an instruction about restraints might be advisable because jurors had expressed concern for their safety. However, defense counsel ultimately decided to forgo an instruction "at this point," noting that if jurors "raise[d] the issue, which they might," it could be addressed at that time.

### ii. Discussion

"In general, the 'court has broad power to maintain courtroom security and orderly proceedings' (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269), and its decisions on these matters are reviewed for abuse of discretion. (*People v. Stevens* (2009) 47 Cal.4th 625, 633.) However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' (*People v. Duran* (1976) 16 Cal.3d 282, 290-291.) Similarly, the federal 'Constitution forbids the use of visible shackles . . . unless that use is "justified by an essential

state interest"—such as the interest in courtroom security—specific to the defendant on trial.' (*Deck v. Missouri* (2005) 544 U.S. 622, 624, italics omitted.) We have held that these principles also apply to the use of an electronic 'stun belt,' even if this device is not visible to the jury. (*People v. Mar* (2002) 28 Cal.4th 1201, 1219.)" (*People v. Lomax* (2010) 49 Cal.4th 530, 558-559 (*Lomax*).)

Defendant did not object to being restrained. His attorney expressly agreed with the court that "some kind of restraint" was appropriate, although he preferred it be invisible to jurors. Accordingly, defendant "has forfeited his claim to the extent he contends he should not have been restrained at all, or that the stun belt was an inappropriate form of restraint." (*Foster*, *supra*, 50 Cal.4th at p. 1321; see *People v. Manibusan* (2013) 58 Cal.4th 40, 85.)

Furthermore, the record belies defendant's claim that the court improperly deferred to security personnel in deciding to impose the restraints. It is true that a trial court abuses its discretion if it delegates this decision to law enforcement officers. (*Ervine, supra*, 47 Cal.4th at p. 773; *People v. Hill*, *supra*, 17 Cal.4th at p. 841.) However, "[t]he court here was clearly aware of its obligation to make its own determination on the need for restraints, and not simply defer to the wishes of the prosecutor or courtroom security personnel." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 391; see *People v. Simon* (2016) 1 Cal.5th 98, 117.) Although the court solicited opinions from security staff about the best *type* of restraints to use, given their experience handling defendant and his unusual size and strength, it recognized that the decision to impose restraints could not be based simply on what "somebody in the jail" said. Thus, the court explained that, *in its opinion*,

71

restraints were needed to protect the safety of everyone in the courtroom from another violent outburst by defendant. The court's finding of manifest need is amply supported by the record, which includes escalating instances of defendant's misconduct. The decision to restrain defendant was well within the court's discretion. (See, e.g., *Lomax*, *supra*, 49 Cal.4th at p. 562.) To the extent defendant complains the court failed to consider the "harmful psychological effects" of wearing a stun belt (see *People v. Mar*, *supra*, 28 Cal.4th at pp. 1225-1230), our discussion of this topic in *Mar* was offered for guidance "in *future* trials" (*id.* at p. 1225, italics added). Because defendant's trial occurred over three years before we decided *Mar*, the court cannot be faulted for failing to consider the potential psychological consequences identified in that opinion. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 871; *Bryant, Smith and Wheeler*, at p. 391; *Lomax*, at p. 562.)

Defendant also claims the court erred in failing to instruct the jury to disregard his restraints. He asserts the error was compounded because, although the jury had previously been instructed to disregard courtroom security measures, this instruction was not repeated at the penalty phase and the jury was directed to disregard guilt phase instructions that were not repeated. The record does not support defendant's claim, and any error was harmless.

The trial court's obligation to instruct depends on visibility of the restraints. "In those instances when visible restraints must be imposed the court shall instruct the jury *sua sponte* that such restraints should have no bearing on the determination of the defendant's guilt. However, when the restraints are concealed from the jury's view, this instruction should not be given unless requested by defendant since it might invite initial

attention to the restraints and thus create prejudice which would otherwise be avoided." (*People v. Duran*, *supra*, 16 Cal.3d at pp. 291-292 (*Duran*).) Nothing in the record demonstrates that defendant's restraints were visible *to the jury*. Although the court observed that it could see a handcuff and the outline of the belt from its vantage point on the bench, defense counsel was skeptical that the jury could see the restraints. He preferred to avoid drawing the jury's attention to them with an instruction. Because there is no evidence any juror actually saw the stun belt or restraints, we cannot say the court erred in failing to give an instruction against the wishes of defendant's attorney. (See *Foster*, *supra*, 50 Cal.4th at p. 1322; *Ervine*, *supra*, 47 Cal.4th at p. 773; *People v. Livaditis* (1992) 2 Cal.4th 759, 775.) "In these circumstances, an instruction may have achieved the opposite result than was intended by *Duran* by calling attention to defendant's restraints when, otherwise, the jury would have been unaware of them." (*People v. Lopez* (2013) 56 Cal.4th 1028, 1080 (*Lopez*).)

Moreover, any error in failing to instruct was clearly harmless. "The purpose of requiring the instruction is to prevent the jury from inferring that, because a defendant charged with a violent crime is restrained, he is 'a violent person disposed to commit' the charged crime. (*Duran*, *supra*, 16 Cal.3d at p. 290.) Where, however, as here, a defendant has been convicted of a special circumstance murder, the rationale requiring a sua sponte instruction is no longer applicable." (*Lopez*, *supra*, 56 Cal.4th at p. 1081.) The jury had already convicted defendant of murdering Simon Francis in the course of a robbery. Under any standard, its penalty phase verdict would not have been affected by the absence of an instruction on

defendant's restraints. (See *ibid.*; see also *People v. Slaughter* (2002) 27 Cal.4th 1187, 1214.)

### d. Ineffective Assistance of Counsel

Defendant argues his attorney rendered constitutionally ineffective assistance in certain proceedings following the courtroom outburst. "In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' [Citations.] Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*Ledesma*, *supra*, 39 Cal.4th at pp. 745-746; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.) Defendant fails to show that his attorney's performance was constitutionally deficient or that the penalty verdict would have been different absent counsel's asserted errors, whether considered individually or cumulatively.

Defendant first argues his attorney was ineffective for failing to object to the use of restraints, or at least to the court's decision to restrain him with both chains and a stun belt. However, the violence of defendant's courtroom outburst, and the extreme difficulty deputies had in subduing him, made the legitimacy of ordering these restraints manifest. A decision not to pursue futile or frivolous motions does not make an attorney ineffective. (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) Counsel wisely conceded the need for increased security measures and focused his efforts on advocating for the least visible forms of restraint. Defendant now argues having an armed deputy stationed behind him would have been preferable to the stun belt. It is difficult to conclude that such an overt action would have been preferable to restraints that may not have actually been seen by jurors. Counsel could well have concluded this option would emphasize defendant's perceived dangerousness. A deputy standing or sitting close to him at all times, in stark departure from earlier practice, would surely have been more conspicuous than a slight bulge in defendant's clothing from the stun belt. As to the complaint that chains were used in addition to a belt, it is unclear how defendant could have been prejudiced by the lack of an objection because the record does not establish that the jury could see *either* type of restraint.

Defendant next complains his attorney did not seek additional instructions regarding his absence from court the day after the outburst. The court twice admonished the jury not to speculate about defendant's absence or consider it in any way in reaching a decision. Defendant argues his counsel should have sought an instruction explaining he was "voluntarily absent from the courtroom *for good cause*." It is unclear what this

phrase means, and it would likely have been just as opaque to the jury. Jurors might have mistakenly thought defendant had been excluded from court for his disruptive behavior. Defense counsel could reasonably have preferred the admonition that was given. Any hints about why defendant was not present risked emphasizing his upsetting behavior the previous day.

Finally, defendant asserts counsel should have objected to the prosecution's use of the courtroom outburst as aggravating evidence under section 190.3, factor (b). Such an objection would have been futile because defendant's conduct was admissible. Section 190.3, factor (b) directs the jury to consider, at the penalty phase of a capital case, the "presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Defendant struggled violently with the nine deputies who tried to subdue him, injuring some of them in the confrontation. This conduct constituted criminal assault and battery and manifestly "involved the use or attempted use of force or violence." (§ 190.3, factor (b).) Counsel was not ineffective for failing to raise a futile objection to this relevant aggravating evidence. (See *People v. Thompson*, *supra*, 49 Cal.4th at p. 122.)

### 2. *Victim Impact Evidence*

Simon Francis had been married less than two months when he was murdered. Over defendant's objection, the court admitted a redacted videotape of Francis's wedding during the penalty phase of trial. The prosecutor played a four-minute excerpt, which shows Francis having cake, throwing the bride's garter, and dancing to the song "Tequila." Defendant claims the court abused its discretion in admitting the videotape because it

was cumulative of other evidence and likely to provoke an irrational response, especially considered in juxtaposition with the surveillance video of the crime. The redacted videotape was properly admitted.

"The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' ([*Payne v. Tennessee* (1991) 501 U.S. 808, 825.]) State law is consistent with these principles. Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*Lewis and Oliver*, *supra*, 39 Cal.4th at pp. 1056-1057; see *People v. Pollock* (2004) 32 Cal.4th 1153, 1180.)

Victim impact evidence presented through videotape "may be relevant to the penalty determination, because it 'humanize[s] [the victim], as victim impact evidence is designed to do.' (*People v. Kelly* (2007) 42 Cal.4th 763, 797.)" (*People v. Dykes* (2009) 46 Cal.4th 731, 784 (*Dykes*).) It can also sometimes be problematic. (See, e.g., *People v. Sandoval* (2015) 62 Cal.4th 394, 442.) We have advised trial courts to "exercise great caution in permitting the prosecution to present victim-impact evidence in the form of a lengthy videotaped or filmed tribute to the victim. Particularly if the presentation lasts beyond a few moments, or emphasizes the childhood of an adult victim, or is accompanied by stirring music, the medium itself may assist in creating an emotional impact upon the jury that goes beyond what the jury might experience by viewing still photographs of the victim or listening to the victim's bereaved parents." (*People v. Prince* (2007) 40 Cal.4th 1179, 1289.) That said, "[t]here is no bright-line rule pertaining to the admissibility of videotape

recordings of the victim at capital sentencing hearings. (*People v. Prince, supra*, 40 Cal.4th at p. 1288.) We consider pertinent cases in light of the general understanding that the prosecution may present evidence for the purpose of reminding the sentencer that ' "the victim is an individual whose death represents a unique loss to society and in particular to his family" ' (*Payne*[ *v. Tennessee*], *supra*, 501 U.S. at p. 825), but that the prosecution may 'not introduce irrelevant or inflammatory material' that ' " 'diverts the jury's attention from its proper role or invites an irrational, purely subjective response.' " ' (*People v. Edwards* [(1991)] 54 Cal.3d [787,] 836.)" (*Dykes*, at p. 784.)

The four-minute wedding video shown here resembles other videotape evidence held permissible. In *Dykes*, for example, the prosecutor played a videotape of the victim and his family visiting Disneyland. (*Dykes*, *supra*, 46 Cal.4th at p. 783.) We approved of the trial court's precautions, which included reviewing the videotape itself and requiring that its audio track be deleted. (*Id.* at p. 784.) After viewing that tape ourselves, we observed that it showed only "ordinary activities" and family interactions. (*Id.* at p. 785.) "The videotape is an awkwardly shot 'home movie' depicting moments shared by [the victim] with his family shortly before he was murdered. The videotape does not constitute a memorial, tribute, or eulogy; it does not contain staged or contrived elements, music, visual techniques designed to generate emotion, or background narration; it does not convey any sense of outrage or call for vengeance or sympathy; it lasts only eight minutes and is entirely devoid of drama; and it is factual and depicts real events." (*Ibid.*) In *People v. Brady* (2010) 50 Cal.4th 547, 579 (*Brady*), we upheld the admission of a four-minute videotape of the victim

celebrating Christmas with his family, only two days before he was murdered. And in *People v. Vines* (2011) 51 Cal.4th 830, 888 (*Vines*), it was not error it admit a five-minute videotape "of 'home movie' quality" that showed the victim singing, dancing, and rapping with family members and in a high school performance.

The videotape here was similar. Although shot by a wedding videographer, its quality resembles a "home movie" more than a professional production. It depicts a real event in the victim's life, shortly before his murder. It is "not enhanced by narration, background music, or visual techniques designed to generate emotion," nor does it "convey outrage or call for vengeance or sympathy." (*Brady*, *supra*, 50 Cal.4th at p. 579.) It is a standard wedding video. It humanizes the murder victim but contains nothing that would divert the jury from its proper function. (See *Vines*, *supra*, 51 Cal.4th at p. 888.) Defendant complains the videotape was cumulative of other evidence because a bridesmaid testified that the victim had married shortly before his death. However, the videotape conveyed more than the simple fact of the victim's marriage. The prosecution was entitled to show the jury what the victim was like and convey the loss suffered by his friends and family. (See *Vines*, at p. 888; *Brady*, at p. 579.)

Defendant contends the wedding videotape was especially problematic because the jury also saw a videotape that captured surveillance footage of the victim's death. Beyond asserting the point, however, defendant does not explain why the mere existence of other evidence in the same format would have a "synergistic effect" rendering the videotape prejudicial. Although video footage juxtaposing the victim in life and in death might create prejudice in some circumstances, here the

trial court took steps to ensure that the wedding video would not inflame the jury's emotions. The court first required the prosecutor to reduce the videotape's length. It carefully reviewed the edited portion and ordered the prosecutor to remove a segment that showed the bride receiving communion during the ceremony. Finally, the court instructed the jury that the videotape, along with other victim impact evidence, "ha[d] been introduced for the purpose of showing the specific harm caused by defendant's crime" and could "not be considered . . . to divert your attention from your proper role of deciding whether or not the defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional evidence." The court exercised appropriate caution and ensured that the videotape was not overly emotional or inflammatory. Its admission of the tape was not an abuse of discretion.

### 3. *"Gangsta Rap" During Carver's Assault*

While describing defendant's assault on Patrick Carver, Lawrence Smith testified that defendant asked a friend "to put on a gangsta rap tape named Dr. Dre." Defendant said, " 'You know how I get when I hear my Dre.' " Once the music was playing, defendant confronted Carver. Defendant now argues the court abused its discretion and violated due process in overruling his objections to this testimony about "gangsta rap." The evidence was relevant and not unduly prejudicial.

The court did not abuse its discretion in allowing the witness's brief reference to "gangsta rap." As we have explained, the court's discretion to exclude evidence under Evidence Code section 352 is somewhat narrower at the penalty phase than at

the guilt phase of trial. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 834-835.) The prosecution is entitled to present a full picture of the circumstances surrounding a defendant's prior criminal acts under section 190.3, factor (b). (*Jablonski*, at pp. 834-835; see *Virgil, supra,* 51 Cal.4th at p. 1276.) Defendant's request of a soundtrack for his beating of Carver showed the callousness of his crime.

Defendant relies on various cases precluding admission of evidence about a defendant's gang *membership*, but these cases are inapposite. No evidence suggested that defendant was active in or involved with criminal street gangs. Nor was the jury likely to draw this inference from his musical selection.

### *4.    Constitutionality of Death Penalty Law*

Defendant raises several challenges to the constitutionality of California's capital sentencing scheme. This court has previously rejected all of these claims, and we do so again. Specifically, we continue to hold the following:

"Section 190.2 adequately narrows the category of death-eligible defendants and is not impermissibly overbroad under the requirements of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." (*Winbush, supra,* 2 Cal.5th at p. 488; see *People v. Wall* (2017) 3 Cal.5th 1048, 1072.) Section 190.3, factor (a), directing the jury's consideration to circumstances of the crime, does not result in an arbitrary and capricious imposition of the death penalty. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1129; see *People v. Salazar* (2016) 63 Cal.4th 214, 255.) " ' "Defendant's argument that a seemingly inconsistent range of circumstances can be culled from death penalty decisions proves too much. What this reflects is that each case is judged on its facts, each defendant

on the particulars of his offense. Contrary to defendant's position, a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances." ' " (*Winbush*, at p. 489.)

"The federal Constitution does not require that the court designate which factors are aggravating or mitigating, or instruct the jury that certain factors are relevant only in mitigation." (*Winbush, supra,* 2 Cal.5th at p. 490.) Moreover, the use of restrictive adjectives such as "extreme" and "substantial" in section 190.3's description of mitigating circumstances does not impermissibly limit the jury's consideration of mitigating factors. (*People v. Rices* (2017) 4 Cal.5th 49, 94; see *People v. Jones* (2017) 3 Cal.5th 583, 620 (*Jones*).)

The death penalty is not unconstitutional for failing to require "findings beyond a reasonable doubt that an aggravating circumstance (other than Penal Code section 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235; see *Winbush, supra,* 2 Cal.5th at p. 489; *People v. Clark* (2016) 63 Cal.4th 522, 643-644.) "This conclusion is not altered by the decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), *Ring v. Arizona* (2002) 536 U.S. 584, and *Hurst v. Florida* (2016) 577 U.S. __ [193 L.Ed.2d 504, 136 S.Ct. 616] (*Hurst*)." (*People v. Henriquez* (2017) 4 Cal.5th 1, 45 (*Henriquez*).)

"The jury may properly consider evidence of unadjudicated criminal activity involving force or violence under factor (b) of

section 190.3 and need not make a unanimous finding on factor (b) evidence." (*People v. Clark, supra*, 63 Cal.4th at p. 644; see *Jones, supra*, 3 Cal.5th at p. 617-618.) The use of unadjudicated criminal activity as an aggravating factor does not violate a defendant's right to due process or a jury trial. (*Winbush, supra*, 2 Cal.5th at p. 489.)

"The federal Constitution does not require that a burden of proof be placed on the prosecution at the penalty phase. [Citation.] 'Unlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification.' [Citation.] The trial court did not err in failing to instruct the jury that the prosecution had the burden of persuasion regarding the existence of aggravating factors or the appropriateness of the death penalty. [Citation.] 'Nor is an instruction on the *absence* of a burden of proof constitutionally required.' " (*Jones, supra*, 3 Cal.5th at p. 619.) "On the contrary, trial courts should not instruct on any burden of proof or persuasion at the penalty phase because sentencing is an inherently moral and normative function, and not a factual one amenable to burden of proof calculations." (*Winbush, supra*, 2 Cal.5th at p. 489.)

"The lack of written findings by the jury during the penalty phase does not violate the federal Constitution or deprive a capital defendant of meaningful appellate review." (*Winbush, supra*, 2 Cal.5th at p. 490; see *Henriquez, supra*, 4 Cal.4th at p. 46.) Nor does the federal Constitution require intercase proportionality review, assessing the relative culpability of defendant's case compared to other murders. (*Winbush*, at p. 490; *Jones, supra*, 3 Cal.5th at p. 620.) The death penalty statute does not violate equal protection by

providing different procedural safeguards to capital and noncapital defendants. (*Henriquez*, at p. 46; *People v. Thompson*, *supra*, 1 Cal.5th at p. 1130.) Finally, we have repeatedly held that California's use of the death penalty does not violate international norms or evolving standards of decency in violation of the Eighth and Fourteenth Amendments. (*People v. Thompson*, at p. 1130; see *Henriquez*, at p. 47; *Winbush*, at p. 490.)

D. *Cumulative Error*

Defendant claims that even if errors at the guilt and penalty phases were individually harmless, they were cumulatively prejudicial. We assumed error in the admission of testimony arguably conveying the substance of a hearsay declarant's out-of-court identification and in defendant's absence during one day of the penalty phase trial. Each of these assumed errors was harmless, as were any other possible errors we contemplated. No cumulative prejudicial effect warrants reversal. (See *Bolden*, *supra*, 29 Cal.4th at pp. 567-568.)

## III.  DISPOSITION

The judgment is affirmed.


                                        **CORRIGAN, J.**


**We Concur:**


**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Bell
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S080056
**Date Filed:** May 2, 2019
_____

**Court:** Superior
**County:** Stanislaus
**Judge:** David G. Vander Wall

_____

**Counsel:**

Melissa Hill, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, Sean M. McCoy and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Melissa Hill
P.O. Box 2758
Corrales, NM  87048
(505) 898-2977

William K. Kim
Deputy Attorney General
2550 Mariposa Mall, Room 5090
Fresno, CA  93721
(559) 477-1675