Filed 6/21/21  P. v. Gardner CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>RYAN THOMAS GARDNER,<br><br>  Defendant and Appellant. | H047396<br>(Santa Cruz County<br>Super. Ct. No. 19CR02893) |

A jury convicted Ryan Thomas Gardner of making criminal threats and false imprisonment.  On appeal, Gardner raises a single claim of evidentiary error related to his conviction for criminal threats, contending the trial court erred by allowing the victim to testify that Gardner wanted her to get an abortion.  For the reasons explained below, we affirm the judgment.

### I.  FACTS AND PROCEDURAL BACKGROUND

A. *Procedural Background*

In May 2019, the Santa Cruz County District Attorney filed an information charging Gardner with making criminal threats against Jennifer C.[1]  (Pen. Code, § 422[2];

---

[1] To protect the privacy of the victim, we refer to her initially by her first name and the first initial of her last name.  At times thereafter, we refer to the victim by her first name only.  (Cal. Rules of Court, rule 8.90(b)(4).)

[2] Unspecified statutory references are to the Penal Code.

count 1) and false imprisonment of Jennifer (§ 236; count 2).

In July 2019, a jury heard evidence and found Gardner guilty as charged. The trial court sentenced Gardner to the upper term of three years in prison on count 1 and to 140 days in county jail on count 2 to run concurrent with count 1.[3] The trial court also imposed various fines and fees.

B. *Pretrial Evidentiary Ruling*

Gardner moved in limine to preclude Jennifer from testifying at trial about information she had given in an interview with a district attorney investigator. Defense counsel told the trial court that there had been a discussion between Jennifer and the investigator "in which the pregnancy comes up and she relates to the inspector that my client suggested that she should get an abortion and said as many as ten times." Defense counsel asserted that this information was prejudicial and without probative value.

The prosecutor countered that the information was relevant because it went to the "reasonableness of [Jennifer's] fear in terms of not only for herself but for the unborn child that she was carrying" and Gardner's intimation that he wanted to terminate that pregnancy combined with making threats "underscores the fear she was feeling that day." Defense counsel responded that "under the circumstances of this case that's not a reasonable amount of probative value that should outweigh the prejudice here."

After hearing argument from the parties, the trial court ruled that it was "going to exclude that abortion stuff." Shortly after the trial court issued this ruling, Jennifer testified as the People's first trial witness.

---

[3] The trial court also sentenced Gardner for a separate case (No. 15CR01738) that involved crimes against a former girlfriend. At trial, the trial court took judicial notice of Gardner's guilty plea in case No. 15CR01738 to felony stalking, false imprisonment, and violating a restraining order.

B. *Evidence Presented at Trial*

Gardner and Jennifer dated for 10 months. After the first few months of their relationship, Gardner and Jennifer began to argue over Gardner's drug problem and his use of dating applications to meet other women. When he was on drugs, Gardner would get violent. During one argument, Gardner locked Jennifer in a room overnight and took her bag of clothes. In another incident, he appeared at her work and attacked her. There were also other occasions in which Gardner was violent toward Jennifer, prevented her from leaving, or took her phone. She did not report these incidents to the police because she was afraid; Gardner would get violent when she mentioned the police. Jennifer stayed in the relationship "out of fear" and because she did not want Gardner to kill himself, which he threatened to do.

In September 2018, Jennifer and Gardner discovered Jennifer was pregnant. Jennifer's pregnancy was one of the reasons she stayed in the relationship with Gardner.

The incident underlying the charges against Gardner occurred on Thanksgiving Day, November 22, 2018. Jennifer and Gardner were still in a relationship. Jennifer was with her family and Gardner was supposed to come over. However, he spent the morning somewhere else and Jennifer got upset. She left to go look for Gardner because she guessed he was "with another girl."

Jennifer drove her Ford Mustang to Gardner's house. After she arrived at his house, she pulled over to the right a little past his house, parked in between two cars, and tried to call him. While she was calling him and only a few minutes after she had pulled over, Gardner pulled up next to her in the middle of the road in a Ford Expedition, a car that was "a lot larger" than her own.

After he had pulled up next to Jennifer, and while they were each sitting in their respective driver's seats, Gardner began yelling at Jennifer through his passenger window. They argued for a couple minutes and, after Gardner started getting more aggressive, Jennifer tried to leave. When she tried to back up, Gardner backed up his car.

3

When she tried to go forward, Gardner went forward. Through these maneuvers, Gardner blocked Jennifer from leaving. Jennifer estimated he did this back-and-forth movement two to three times.

Eventually, Jennifer was able to get by Gardner's car and started driving away. She noticed Gardner was following her, so she sped up. Gardner then sped up. They were driving in a residential area, and Gardner was driving "pretty fast and close." Jennifer was nervous and was trying to get to the freeway.

As she continued driving, Jennifer spoke to Gardner on the phone. She told Gardner to stop following her. Gardner told her to pull over or he was "going to rear end" her. On direct examination, the prosecutor questioned Jennifer about her pregnancy and her feelings while Gardner followed her in his car. Jennifer stated she "made a bunch of turns," but he continued to follow her and she was afraid. She confirmed she was pregnant at the time. The prosecutor then asked "Were you thinking about that?" and Jennifer responded "Yes." When Gardner told Jennifer on the phone to pull over or he was going to "rear end" her, she took that as a serious threat. The prosecutor inquired "Why?" and she responded that "Because mostly - - I mean I'm pregnant at this point. I'm thinking about that more than anything and - - I mean his actions had progressed, so I thought that was something he would go through with."

Due to her fear, Jennifer was shaking and could barely hit the gas or brake pedals as she was driving. She felt like she was grabbing the steering wheel to brace herself for the impact that could happen. After she told Gardner to stop following her or she would call the police, he stopped following her.

Following this Thanksgiving Day incident, Gardner persisted in stalking and contacting Jennifer. Approximately two weeks later, she ended their relationship and reported his conduct to the police.

Defense counsel cross-examined Jennifer about her direct testimony. Among other topics, defense counsel asked Jennifer the following question: "In your -- toward

4

the end of your interview with [the district attorney investigator], is it -- do you recall that she asked you, 'Has he ever threatened to hurt or kill your unborn baby?' " Before Jennifer answered, the prosecutor objected to the question and referenced the prior "[Evidence Code section] 352 discussion" conducted pretrial. The prosecutor reminded the trial court that it had ruled that statements about the baby could not come in. The trial court responded, "I don't think so. You convinced me the other way. You did convince me the other way." Defense counsel did not intervene in this exchange or remind the trial court that it had excluded testimony about abortion.

Following this exchange, defense counsel resumed his questioning of Jennifer and asked her whether she had told the district attorney investigator that Gardner had not threatened to hurt or kill her unborn baby. Jennifer agreed she had said that. Defense counsel told the trial court he had no more questions for Jennifer.

Before the prosecutor asked Jennifer further questions, and at the prosecutor's request, the parties had a sidebar discussion with the trial court. The prosecutor stated, "I just want to be very clear. [¶] My understanding of the ruling regarding his response - - he - - she told him she was pregnant. He then said, 'You need to get an abortion,' seven to ten times. My understanding of that ruling was that you said that was excluded as it was too prejudicial." The trial court stated, "That's not the way I remember it, but it doesn't matter. He opened it." Defense counsel did not object but rather stated, "All right. Having opened, your ruling is that they can inquire about him asking if she would?" The trial court confirmed its ruling. Defense counsel did not object to the trial court's ruling.

On redirect examination, the prosecutor asked Jennifer if she had told the investigator that Gardner had never threatened her or her unborn baby and Jennifer responded "I guess so." The prosecutor then questioned Jennifer about what Gardner had told her when she had informed him she was pregnant. Jennifer stated, "[a]t first he asked me to get an abortion." She stated that Gardner returned to the subject of wanting

5

an abortion "[m]aybe like three times" over a period of time. Jennifer also testified that she had looked through his phone and internet history and found that he had been "looking up how to naturally cause a miscarriage." This "[t]errified" her because she wanted to have the baby and have a healthy pregnancy. The prosecutor then asked "Was that on your mind on Thanksgiving Day as you were driving?" and Jennifer responded that it was. The prosecutor inquired if she thought on that Thanksgiving Day that Gardner might hurt her and her unborn child. Jennifer responded, "On that day, yeah."

Two other women who had previously dated Gardner also testified. Each woman testified that during the relationship Gardner had subjected her to violence, threats, and manipulation.

The defense did not present any evidence at trial.

## II. DISCUSSION

Gardner seeks reversal of his conviction for criminal threats (count 1).[4] Gardner asserts the trial court prejudicially erred by allowing the prosecutor to elicit Jennifer's testimony that Gardner had on multiple occasions asked her to get an abortion and she had discovered that he had done research on how to cause a miscarriage. Gardner argues this evidence was inadmissible under the Evidence Code as irrelevant and prejudicial and further contends that its admission violated Gardner's constitutional right to due process.

A. *Legal Principles*

"Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is defined as 'evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption

_____

[4] Gardner does not raise any claim related to his conviction for count 2 (false imprisonment).

6

of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.) ' "Prejudice," as used in Evidence Code section 352, is not synonymous with "damaging." [Citation.] Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial.' " (*People v. Miles* (2020) 9 Cal.5th 513, 587 (*Miles*).)

" 'A trial court has "considerable discretion" in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects.' " (*Miles*, *supra*, 9 Cal.5th at p. 587.) Our review of a trial court's rulings regarding relevancy and admissibility under Evidence Code section 352 is for abuse of discretion. (*Ibid.*) " ' "We will not disturb a trial court's exercise of discretion under Evidence Code section 352 ' "except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " ' " (*Id.* at pp. 587–588, italics omitted.)

B. *Analysis*

Gardner contends the trial court abused its discretion in admitting at trial Jennifer's testimony that Gardner repeatedly requested she have an abortion and he had researched ways to cause a miscarriage. Gardner asserts this evidence was irrelevant and, even if relevant, its probative value was outweighed by its prejudicial impact because the "[t]he subjects of abortion and personally induced miscarriages evoke strong emotions from members of the public." The Attorney General argues the evidence was relevant to "elements of making a criminal threat that she reasonably felt sustained fear for her own safety," was also properly admitted to "explain or rebut testimony or inferences from defense cross-examination" of Jennifer, and had "little or no risk of a prejudicial effect that was unrelated to its probative value."

7

Turning first to the question of relevance, we are not convinced by Gardner that, under the circumstances of this case, the evidence had no probative value as to the criminal threats charge. "To establish a criminal threat, the prosecution must prove: (1) the defendant willfully threatened death or great bodily injury to another person; (2) the threat was made with the specific intent that it be taken as a threat, regardless of the defendant's intent to carry it out; (3) the threat was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution'; (4) the threat caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety'; and (5) this fear was reasonable under the circumstances. (§ 422, subd. (a); see *People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)" (*People v. Turner* (2020) 10 Cal.5th 786, 826.)

The abortion evidence was relevant in that it tended to establish Jennifer's fear upon hearing Gardner's threat to rear end her car. When he made this threat, the jury could reasonably infer Gardner and Jennifer knew she was still pregnant. Her testimony about Gardner's prior statements and actions regarding her pregnancy supports an inference that she reasonably and subjectively feared for her safety when he threatened her with his much larger car. Jennifer testified that during the incident she was afraid Gardner would hurt her and her unborn child.

Moreover, the cross-examination by defense counsel enhanced the evidence's probative value. On cross-examination, defense counsel sought to have Jennifer confirm that she had previously told the district attorney's investigator that she was not afraid for the safety of her unborn child, which Jennifer then confirmed. This testimony potentially called into question whether she subjectively or objectively feared for her safety, in that the jury could infer she either did not subjectively or objectively fear for her safety, even though she was pregnant. The prosecutor on redirect examination then sought to challenge the inference that Jennifer actually believed Gardner would not harm her or her

8

unborn child.  Thus, this evidence—originally elicited by Gardner's counsel—could assist the jury in resolving the material question of whether the prosecutor had proven Jennifer subjectively and reasonably feared for her own safety.

"Under the doctrine of 'opening the door,' one party may render otherwise inadmissible evidence admissible by introducing the topic selectively such as to leave a misleading impression.  [Citations.]  A trial court's ruling on whether rebuttal evidence is admissible on this theory is reviewed for abuse of discretion." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 553.)  Under these facts, we determine the trial court did not abuse its discretion, even though the trial court did not accurately recall its previous ruling on the motion in limine related to the abortion evidence.

Turning to whether the probative value of the evidence outweighed a substantial danger of undue prejudice, we are not convinced the evidence presented in this case was unduly prejudicial.  "Evidence is prejudicial within the meaning of Evidence Code section 352 if it ' "uniquely tends to evoke an emotional bias against a party as an individual" ' [citation] or if it would cause the jury to ' " 'prejudg[e]' a person or cause on the basis of extraneous factors." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 475.) " ' "In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)  However, "evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 105 (*Bell*).)

We decide that the evidence that Gardner asked Jennifer to get an abortion and Jennifer discovered that he had looked up ways to cause a miscarriage was on balance not of such a nature that it would inflame the emotions of the jurors or mislead them from

9

their task of deciding whether the prosecutor proved Gardner's guilt of making criminal threats. The testimony on this topic, as discussed above, did not directly engage the morality of abortion but instead tended to prove elements of the charged crime and contextualized for the jury Jennifer's testimony on cross-examination.

Gardner cites to various decisions, primarily by federal courts, for the general proposition that the "subjects of abortion and personally induced miscarriages evoke strong emotions from members of the public." (See, e.g., *Greenville Women's Clinic v. Bryant* (4th Cir. 2000) 222 F.3d 157, 175 [stating there is a "deeply divided societal debate over the morality of abortion"].) While it may be true that the subject of abortion is controversial, the evidence at trial did not go to the morality of abortion as a general matter but rather were relevant to Jennifer's state of mind and the reasonableness of her fear. There were disputed factual issues the jury had to resolve. In this context, Jennifer's testimony did not rise to the level of inflaming the emotions of the jury but rather properly allowed the jury "to logically evaluate the point upon which it is relevant." (*Bell*, *supra*, 7 Cal.5th at p. 105.) In our view, the trial court did not exceed the bounds of reason, and therefore did not exceed its discretion, in allowing the prosecutor to elicit this testimony in its redirect examination of Jennifer.

Likewise, the trial court's admission of the evidence did not violate Gardner's constitutional right to due process. In our judgment, the admission of this probative evidence did not render Gardner's trial fundamentally unfair. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 913.) Therefore, its admission did not constitute a violation of Gardner's right to due process.

### III. DISPOSITION

The judgment is affirmed.

10

_____

Danner, J.

WE CONCUR:


_____

Greenwood, P.J.



_____

Grover, J.



**H047396**
*People v. Gardner*